# IN THE COURT OF APPEALS OF TENNESSEE,
## AT NASHVILLE

_____

|  |  |  |
|---|---|---|
| **LUNN REAL ESTATE INVESTMENTS, INC.**, | ) ) ) | Davidson County Circuit Court No. 96C 1688 |
| Plaintiff/Appellant. | ) ) | |
| VS. | ) ) | C.A. No. 01A01-9704-CV-00191 |
| **BOILER SUPPLY COMPANY, INCORPORATED**, | ) ) ) ) | |
| Defendant/Appellee. | ) ) | |

From the Circuit Court of Davidson County at Nashville.
**Honorable Hamilton Gayden, Jr., Judge**

```
┌─────────────────────────┐
│       FILED             │
│                         │
│     May 6, 1998         │
│                         │
│   Cecil W. Crowson      │
│  Appellate Court Clerk  │
└─────────────────────────┘
```

**H. Naill Falls, Jr.**, FALLS, RAMSEY & VEACH, P.L.C., Nashville, Tennessee
Attorney for Plaintiff/Appellant.


**Charles Patrick Flynn**, Nashville, Tennessee
Attorney for Defendant/Appellee.

OPINION FILED:

**AFFIRMED AND REMANDED**


**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**TOMLIN, Sr. J.**: (Concurs)

This case involves a contractual dispute between the lessor and lessee of certain commercial property. The appellant, Lunn Real Estate Investments, Inc. (Lunn), leased the subject premises to the appellee, Boiler Supply Company, pursuant to an agreement executed by the parties on January 1, 1989. On August 31, 1995, Lunn served Boiler Supply with written notice that it was requiring the latter to vacate the premises by October 1, 1995.[1] On October 5, 1995, Lunn filed a detainer action in the general sessions court seeking possession of the property. By order entered April 19, 1996, the court found the claim for possession moot due to Boiler Supply's vacating of the premises on November 30, 1995, but awarded Lunn a judgment for two months holdover rent plus attorney's fees.[2] Lunn appealed the decision to circuit court where, after a hearing, a judgment was entered for Lunn for $17,790. Lunn now appeals from that decision to this Court requesting additional compensatory damages, due to Boiler Supply's alleged failure to maintain the premises in accordance with the contract, and attorney's fees. For the reasons set forth below, we affirm.

The subject property is approximately 50 years old and consists of two main parts: the main or office building, covered with a "flat" or tar roof and a shed or "warehouse" structure, built and attached thereto in the 1960s. The warehouse roof is rounded and made of sheet metal. The property housed the business of Boiler Supply for over 30 years. Both the property and the business were family owned. Eddie Lunn, Sr., founded and operated the business until his death in 1978. Since then, his son, Eddie Lunn, Jr., has served as its president.[3] Gloria Lunn Allison and Beverly Lunn Young began serving on the board of directors of Boiler Supply sometime after their father's death. Boiler Supply originally leased the property from Mr. Lunn, Sr. and his wife, Gladys. In 1984, Lunn Real Estate Investments was established and Boiler Supply began leasing the property from the appellant. Lunn's owners were Mr. Lunn, Jr., his mother, Gladys and two sisters, Ms. Allison and Ms. Young. Its assets consisted of three properties, including the one in question. In

---

[1]The record indicates that in August 1995, pursuant to a separate lawsuit brought by Boiler Supply, a judgment was entered holding that the lease had previously terminated in December 1991 and that Boiler Supply had been a month-to-month tenant from that point forward. It was Boiler Supply's contention that the lease had terminated at that time.

[2]The general sessions court awarded judgment in the amount of $7,790 plus approximately $4,000 in attorney's fees.

[3]Mr. Lunn testified that Boiler Supply is in the business of "repair[ing] big boilers. The kind . . . that are used in hospitals, the operations of industries, [and] large commercial buildings, . . ." It also engages in construction projects and its employees include sales engineers, electricians and welders.

May 1990, the family assets were divided resulting in Ms. Allison and Ms. Young relinquishing their respective interests in Boiler Supply and Mr. Lunn, Jr. relinquishing all interest in Lunn Real Estate.

Throughout the years, various agreements were entered into regarding the leasing of the premises. The one at issue provides the following, as here relevant:

> 2. Terms of Lease. Lessor leases to Lessee, to have and to hold the same subject to all terms and conditions set forth herein for a term of three (3) years, beginning on the 1st day of January, 1989, and ending on the 31st day of December, 1992, unless sooner terminated as provided herein . . .[4]
>
> . . . .
>
> 7. Maintenance of Premises
>
> 7.1 Lessee agrees at its sole risk and expense to maintain the Premises in good and substantial condition, order and repair except for ordinary depreciation and ordinary wear and tear throughout the Term of this Lease. Lessee agrees not to commit any waste of the Premises, and upon the expiration or other termination of this Lease, Lessee covenants to surrender possession of the Premises to Lessor in as good a condition as the same were in at the commencement of the Term, except for reasonable wear and tear and normal depreciation. Lessee shall maintain and make all replacements of depreciable items and capital items located on said Premises.
>
> . . . .
>
> 7.3 In the event Lessee should neglect to maintain the Premises or to repair or replace any damage or injury caused by Lessee, it's agent or invitee to the Premises within thirty (30) days of occurrence, Lessor shall have the right (but not the obligation) to cause repairs and corrections to be made, and any reasonable cost thereof shall be payable to Lessee to Lessor as additional rent on the next rental installment date.
>
> . . . .
>
> 8.1 Lessee shall not create any openings in the roof or exterior walls, nor make any alterations, additions, or improvements to the Premises without prior consent of Lessor. Lessee shall have the right, but not the obligation, at all times to install equipment, machinery, additional air conditioning and heating equipment and trade fixtures, provided Lessee complies with all applicable governmental laws, ordinances and regulations; . . .
>
> 8.2 . . . Lessor recognizes that from time to time throughout the initial and any extension or renewal term hereof, Lessee will cause to be placed upon the Premises certain machinery, equipment, fixtures and trade fixtures. Lessor hereby acknowledges and agrees that all

---

[4]The obvious ambiguity in this provision led to the unrelated litigation hereinabove mentioned.

items of machinery, equipment, fixtures and trade fixtures so placed or located upon the Premises shall be and remain the sole property of Lessee . . . and shall be and remain personal property regardless of the manner in which said equipment and fixtures are attached to the Premises; that such equipment and fixtures shall not at any time be deemed a part of the realty; and that such equipment and fixtures may be removed from the Premises by Lessee . . . at any time before the expiration or other termination of this Agreement; . . .

. . . .

21. Holding Over. Should Lessee or any of its successors in interest remain in possession of (or hold over) the Premises or any part thereof after the expiration of the Term, unless otherwise agreed in writing, such holding over shall constitute and be construed as tenancy from month to month only, at a monthly rental equal to the rent paid for the last month of the Term of the Lease, and otherwise subject to the conditions, provisions and obligations of this Lease insofar as the same are applicable to a month to month tenancy. . . .

22. Events of Default.

. . . .

(b) Lessee shall fail to comply with any Term, provision or covenant of this Lease, other than the payment of rent, and shall not cure such failure within twenty (20) days after due written notice thereof to Lessee;

. . . .

24. Attorneys' Fees. If, on account of any breach or default by Lessor or Lessee of their obligations to any of the parties hereto, under the terms, covenants and conditions of this Lease, it shall become necessary for any of the parties hereto to employ an attorney to enforce or defend any of their rights or remedies hereunder, and should such party prevail, it shall be entitled to any reasonable attorneys' fees incurred in such connection.[5]

The appellant argued before the trial court, and now on appeal, that the appellee breached the lease agreement by failing to comply with its obligations under paragraph 7, or more specifically, by failing to replace depreciable and capital items and by removing five infrared heaters upon vacating the property. Appellant contends that such breach entitles it to additional compensation. In ruling, the trial court found that "there was waste committed," but "not

---

[5]On May 3, 1990, the parties amended the lease to add language stating that at the end of its initial term, it "would automatically be extended at the Lessor's option" until the earlier of certain specified events: the 90th day following the death of Gladys Lunn or the end of the 90th day after which the lessee provides the lessor with a contract of sale for the underlying real estate. The record indicates that Appellee began making attempts to purchase the property in 1992. The amendment further provided that the parties "reaffirm[ed]" the January 1, 1989 Lease Agreement and "agree[d] to be bound by all the terms and provisions [thereof] . . . ."

intentional[ly]." The court continued, "[w]aste in the sense that the sub-ceiling of the metal roof rotted out in places, all of which, in the court's opinion, could have been prevented." The court found, however, that the appellee had not acted "unreasonable" in failing to replace the roofs and expressly held that it was finding for the appellant "in a very small amount." The court awarded a judgment for $7,500, plus $2,500 in attorney's fees and $7,790 representing the two months rent that appellee remained on the premises after being notified to vacate. Finally, the court found that the infrared heaters were fixtures which, under the contract, could be removed by the appellee upon vacating.

Appellant raises the following issues on appeal:

1. In plaintiff-lessor's action against defendant-lessee for breach of a commercial lease agreement, did the trial court err in refusing to enforce a lease clause requiring the lessee to make necessary replacements of depreciable capital items[?]

2. Did the trial court err in ruling the plaintiff-lessor could not recover the repair costs it incurred upon lessee's surrender because the repair costs allegedly exceeded the value of the depreciation caused by lessee's failure to maintain the property[?]

3. Did the trial court err in failing to compensate plaintiff-lessor for lost rents incurred during the time the premises were unleasable and undergoing repairs following lessee's surrender of the premises?

4. Did the trial court err in failing to compensate plaintiff-lessor for the value of heating units lessee removed from the premises in violation of the lease agreement?

5. Did the trial court err in reducing plaintiff's damage award because of acrimony between opposing family members, notwithstanding the undisputed expert proof that plaintiff's damage claims were reasonable and necessary?

Appellee presents the following additional issue:

The trial court erred when it awarded the Plaintiff damages in excess of the hold-over rent which had already been tendered. Because of the tender, the Plaintiff was not entitled to recover attorney's fees or court costs.

Our review of this case is pursuant to Rule 13(d) T.R.A.P. which provides for a *de*

*novo* review upon the record, accompanied by a presumption of correctness of the trial court's findings of fact, unless the evidence preponderates otherwise. ***E.g., Northland Ins. Co. v. State Farm Mut. Auto. Ins. Co.***, 916 S.W.2d 924, 926 (Tenn. App. 1995). No presumption of correctness attaches to the trial court's conclusions of law. ***Lucius v. City of Memphis***, 925 S.W.2d 522, 524 (Tenn. 1996); ***Presley v. Bennett***, 860 S.W.2d 857, 859 (Tenn. 1993).

Appellant's first issue concerns the trial court's alleged error in failing to enforce the lease provision under paragraph 7, section 7.1, which states that the "[l]essee shall maintain and make all replacements of depreciable items and capital items located on said Premises." Appellant argues that section 7.1 is not ambiguous and requires the appellee to replace, at its own expense, those "worn-out" capital items, including the two roofs. Appellee insists that it has no obligation in this respect because it was never given notice and an opportunity to cure pursuant to paragraph 22(b). Appellant counters that the latter provision is inapplicable because it is not now seeking to declare a default under and terminate the lease as it had ended prior to the lawsuit and before Appellee vacated the premises. Appellant further contends that until Boiler Supply had vacated the premises, it could not make a final determination of whether the property had been surrendered in the condition required under paragraph 7.

The trial court found both the 1989 Agreement and its 1990 amendment ambiguous. As to the specific provision in question, the court found that "[i]f read literally, that would mean that by signing this lease, the lessee was required to replace all capitol [sic] items. Not only was that not done by the parties, but The Court does invoke the parol evidence rule, . . . . Basically, this was a conditional lease, . . . that at the death of . . . Gladys Lunn, it evoked the termination part. Or read one way, it almost requires the lessors to sell property to the lessee with three estimates . . . . But that, obviously, wasn't the conduct of the parties, either, and that wasn't done . . . . obviously, the lessee . . . really didn't know what kind of lease they had in the first place. So you have to read that in conjunction with the conduct of the parties before 1989, the fact that this is a family piece of property . . . . I'll have to put all of that into the mix."

The cardinal rule for contract interpretation is to ascertain the intention of the parties and give effect to those intentions consistent with legal principles. ***HMF Trust v. Bankers Trust***

*Co.*, 827 S.W.2d 296, 299 (Tenn. App. 1991). To determine the parties' intent, we first look to the material contained within the four corners of the document itself. Words or phrases contained in the instrument are to be given their ordinary and usual meaning, unless otherwise expressly provided. *Rogers v. First Tennessee Bank Nat'l Ass'n*, 738 S.W.2d 635, 637 (Tenn. App. 1987); *Jaffe v. Bolton*, 817 S.W.2d 19, 25 (Tenn. App. 1991). In determining whether the meaning of the contract is clear or ambiguous, the language in dispute must be examined in context of the entire agreement. *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. App. 1994). If the language of the contract is clear and unambiguous, it must be construed as written. *Cummings v. Vaughn*, 911 S.W.2d 739, 742 (Tenn. App. 1995). In such case, neither party is to be favored when construing the contract. *Heyer-Jordan & Assoc., Inc. v. Jordan*, 801 S.W.2d 814, 821 (Tenn. App. 1990). The language of the contract is said to be ambiguous when its meaning is uncertain and when it can be fairly construed in more than one way, *Gredig*, 891 S.W.2d at 912, or, as stated by the court in *Book-Mart of Florida, Inc. v. National Book Warehouse, Inc.*, 917 S.W.2d 691, 693 (Tenn. App. 1995), "when a court [cannot] perceive the respective obligations of the parties for enforcement." If the contract is determined ambiguous, we are to determine the intention of the parties not only from its language but also from the surrounding facts and circumstances. *HMF Trust*, 827 S.W.2d at 299.

The foregoing rules of construction in mind, we find the plain language of paragraph 7 to require Appellee to maintain and make all replacements of depreciable and capital items. It is important to note, however, that during the course of the lease the parties operated under two different tenancies. The second being a month-to-month tenancy from December 1991 forward. Paragraph 21 of the lease, which pertains to any holdover by the lessee, states that such period shall be construed as a month-to-month tenancy and "subject to the conditions, provisions, and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy." The eviction notice Appellant delivered to Appellee dated August 31, 1995, acknowledges that the latter had been "a month-to-month tenant since December 1, 1991." We do not believe paragraph 7 (as it pertains to the replacement of depreciable items) may reasonably be interpreted to apply to a month-to-month tenancy. Thus, the contract does not require a month-to-month tenant to replace capital items, such

as the roof.[6]

To require the appellee to replace those depreciable and capital items as Appellant suggests, it would seem necessary to know exactly at what point in time the roof and other such items needed replacing. A 1992 "home condition analysis report" conducted on behalf of Appellant and provided to the appellee states that the roofs needed "repair." The report specifically reads: "[t]he structure's cover roof will require repair in order to meet minimum satisfactory requirements. It is advised that a qualified and experienced roof contractor provide bids of repairs. It should be noted that at times it may be difficult to find a qualified contractor to perform repairs on a roof cover. Often they require replacement, due to the implied warranty of repair work on a roof system." The report further states that "[t]he water heating system installation appears not to be functional or a[n] improper installation. Replacement may be necessary." As to the heating and air conditioning systems, the report states that both "appear[ ] not to be working properly" and that the "services of a qualified service person [were] needed" for further evaluation. Nothing in the record indicates that these items were in need of replacement prior to the establishment of the month-to-month tenancy. Moreover, the court found and the record establishes that "[t]here was never a demand to replace the roof at any time until after the [present] lawsuit was filed." We further do not find the last sentence of paragraph 7 to come into play only upon the lessee's surrender of the premises. Certainly, the appellant, as a means of preserving its own property, could have come upon the premises at any time to inspect its condition. We, therefore, conclude that Appellee was not required, as a month-to-month tenant, to replace the depreciable and capital items on the premises. However, we do find the record to support the finding that Boiler Supply improperly maintained the premises (insofar as repair) while in occupancy.

Proof presented at trial included the following: Mr. Lunn testified that Boiler Supply ". . . tried to make repairs on an as needed basis, on both roofs, the metal roof and the tar roof." He acknowledged that during the six years of the lease, no outside roofing company was employed to repair the roofs. He believed the roofs on the property were in as good a condition in November 1995 as they were in January 1989 even though they leaked throughout these years. He was

---

[6]Ms. Allison testified that Appellee paid approximately $19,000 to replace the two roofs after Boiler Supply vacated the premises.

questioned:

> Q.    So those leaks just continued to leak and the roof obviously deteriorated as a result. Wouldn't you agree with that?
>
> A.    I would agree with that. I would have to state that there were repairs to the metal roof in some cases that were made by our own personnel . . . I can't be specific with those, but cases where wind damage or something like that would occur, we would attempt to repair something with our own people, if it were appropriate.

Lunn further acknowledged that the shed roof leaked at the end of the lease. He explained as follows:

> This shed . . . covered a dirt yard, truck unloading dock, and a truck turnaround. . . . it was nothing but dirt . . . . The truck dock was covered with the flat roof that is there . . . this shed was built simply to cover that dirt area.
>
>      . . . I say all of that to say . . . , we don't bring a lot of boilers in there, [but do on occasion]. A boiler, by nature, . . . is an extremely dirty piece of the equipment . . . . We have to clean them . . . . the shed, I don't believe, ever was intended to keep water out completely. The floor was designed to hose down and to wash off.

Lunn stated that the shed was used for pipe and brick storage and, on occasion, used pieces of equipment. Welding work was also performed there. He commented that the type of work done there was "very dirty" and that it was not an "office-type environment." Since Lunn began working at Boiler Supply in 1972, he could never recall a time when the shed roof was water tight. The flat roof also had recurring leaks and it, too, leaked as of January 1989. There were extensive water stains throughout the building at the beginning of the lease as a result of the roof leaks.

Lunn stated that routine manual maintenance was performed on the cooling system, including filter work and replacing the cooling tower, piping, electrical motors and a compressor. Prior to vacating the premises, Boiler Supply resurfaced the driveway on the property and painted the building exterior. It also employed a company to paint the metal roof and replace four missing panels.

Danny Demonbreun testified that he had been in the roofing business for 17 years and

inspected the condition of the roofs in order to bid on their repair/replacement after Boiler Supply vacated the premises. Upon inspection, he found moisture coming from three areas and between the layers of the flat roof, and "quite a bit of rot there where it had been leaking." He concluded that the flat roof was in "very poor condition." As far as maintenance measures, he found that there had been some patching done and possibly some hot asphalt mopping, but it was not uniform in application. The metal roof had problems also, including loose panels which allowed water to get through. Some of the wooden beams underneath the metal roof "had leaked to the extent that they were rotted almost in two." He did not believe the two roofs would have been in the condition in which he found them had they been properly maintained during the past six years. Donald Morris, a real estate appraiser, testified that he inspected and appraised the property in June 1993. He described it at the time as "in a poor state of repair" and also found evidence of "deferred maintenance or lack of maintenance."

Terry Gentry, an electrician, testified that he inspected the building's electrical system sometime in 1996 and concluded that repairs were needed. There were lights that did not burn, some plug covers were missing; he performed "just mainly service work." He also reconditioned the electrical service equipment to "bring it [up] to safety standards." His total charges were $2,075.

Donald Rich, the owner of Rich Construction Company, testified that he inspected the heating and air conditioning units at Boiler Supply in 1996. He found the heating system unrepairable and the air conditioning unit "in real poor shape." He replaced both units at a cost of $12,500. He proposed a charge of $5,800 to "rework" the two units as opposed to replacement. Jimmy Rich, general manager of Rich Construction, also inspected the premises at Appellee's request in December 1995. He found the roof "to be very old, ill repaired" and to leak in several places. He did not consider the building safe. His total charges for general repairs were $5,980.

William Ellis, an employee of Boiler Supply for 26 years, testified on Appellee's behalf. He stated that the condition of the premises was "just about the same" in January 1989 as it was in November 1995. The company's maintenance of the premises from January 1989 forward was the same as during the lifetime of Mr. Lunn, Sr. He denied that there ever came a time when the company began "slacking off" or "just stopped" maintaining the premises, because they "didn't

know whether [they] were going to be there for a hundred years or what." He believed that the condition of the premises in November 1995 was "[i]n some respect . . . better" than it was in January 1989. On cross-examination, Ellis admitted that he had no expertise in roofing or heating and air conditioning. He stated that both roofs had leaked for the past 26 years.

James Oakley testified that he had been employed by Boiler Supply since 1957. He stated that there were problems with the warehouse area roof (leaks occurring on and off) "for the last several years." He maintained that the condition of the property at the end of November 1995 "was essentially the same" as its condition in January 1989 except for the "cosmetic improvements" Boiler Supply made just prior to vacating.

Bill Hawkins, an industrial real estate broker who had opportunity to view the property both in January 1989 and November 1995, testified that its condition during this time period "didn't change drastically." He determined that the property was rentable on the day Boiler Supply vacated the premises at a reduced rate commensurate with its condition. In 1989, he valued the property at approximately $180,000 and in November 1995, at $225,000. These figures were based on the overall condition of the property and the upswing in market conditions during that time period. On cross-examination, Hawkins admitted that he was not a real estate appraiser and that he inspected only the "physical structural parts of the building." He believed the property, at the time Boiler Supply vacated, could be rented at a monthly rate of $2,000. He agreed that during the time period in question, the percentage of appreciation on commercial property in the area was more substantial than the appreciation on this particular property. On redirect examination, Hawkins stated that he believed the rental value of the property from 1989 to 1995 was "about the same."

As we have determined the record to support a finding that Appellee failed to properly maintain the premises, we now address Appellant's issue regarding whether the trial court erred in disallowing a recovery of its entire repair costs because such expenses allegedly exceeded the value of the "depreciation" caused by Appellee's improper maintenance. Appellant's argument is directed at the trial court's ruling at the close of Appellant's proof in regard to its motion to dismiss. In granting the motion, in part, the court stated: "[t]he cost to the repairs produced by the [Appellant] are much greater than the depreciation of the property based on the waste that's been proven . . . ."

The court held that it was relying on the "general proposition that if the costs to repair exceed the depreciation as a result of the waste, then the depreciation is the measured damages" and cited *Fuller v. Orkin Exterminating Co.*, 545 S.W.2d 103 (Tenn. App. 1975). The court continued "[Appellant] has put nothing in the record to invoke the magic formula, what was the value of the property before; what was the value of the property afterwards, which there is a difference." At the close of all proof, the court found that "the costs of repairs far exceed the value of this property in 1989, as opposed to the value in 1995, the difference in value is that appreciation."

Appellant contends that the proper measure of damages are those as set forth under the contract. The contract reads that in the event Boiler Supply neglected to maintain the premises, Appellant had the right to "cause repairs and corrections to be made" with the "reasonable costs thereof" payable by Boiler Supply. The damages sought by Appellant include $5,980 for general repairs, $19,000 for roof replacement, $5,800 for heating and air conditioning repair and $2,075 for electrical system repair, for a combined total of $32,855.

The court in *Fuller v. Orkin* held as follows:

> Our appellate courts have uniformly held that the measure of damages for injury to real estate is the difference between the reasonable market value of the premises immediately prior to and immediately after injury but if the reasonable cost of repairing the injury is less than the depreciation in value, the cost of repair is the lawful measure of damages. . . . Of course, the trier of fact can also take into consideration the reasonable cost of restoring the property to its former condition in arriving at the difference in value immediately before and after the injury to the premises.

*Fuller*, 545 S.W.2d at 108 (citations omitted).

As we find the record, the only testimony on the fair market value of the property indicates an appreciation in value of approximately $45,000 from 1989 to 1995. As the property appreciated in value but not to the extent possible due to the appellee's waste, the trial court looked to the requested costs for repair versus the amount of depreciation in terms of waste. The trial court found that the cost of repairs exceeded the amount of depreciation. We imply from the court's ruling that $7,500 represents the costs of repair for which Appellant is reasonably entitled. Although

Appellant has requested some $30,000 in damages we note that the entire replacement costs for the roof ($19,000) are not properly included within this figure as we have previously determined that Boiler Supply had no duty to replace the roof as a month-to-month tenant. We further find the record to reflect that some of the repair costs included replacing certain materials and items on the property which resulted in an actual improvement of the property or a betterment of its condition than was the case in January 1989. We, therefore, conclude that the reasonable costs of repair to which the appellant is entitled, based on the appellee's waste, were properly decided.

Appellant's next issue is whether the trial court erred in failing to compensate it for the lost rents incurred during the time the premises were "unleaseable" and undergoing repairs following surrender. The trial court awarded Appellant damages representing two months rent. Gloria Allison testified that the last repair work performed on the property after Boiler Supply vacated was in May 1996. Efforts were not made to lease the property again until June 1996 after completion of all the repair work. She was asked, "you just made the conscious decision that until you had all of this work done, you weren't . . . going to try to . . . market . . . it; is that right?", she responded, "[t]hat was my decision." Appellant thereafter rented the property to a new tenant at a monthly rate of $3,900. The monthly rental paid by Boiler Supply at the time it vacated was $3,895.

Mr. Hawkins testified that the property could have been rented upon surrender for approximately $2,000 per month. There is no testimony to the contrary. Moreover, Ms. Allison stated that she made a conscious decision to not attempt to rent the premises during this period. After all necessary repairs and replacements were made, the appellant rented the property for $3,900, only $5 more than the monthly rate paid by the appellee at the end of its lease. Thus, this Court is unsure exactly who was getting the better of the deal during those months the appellee was paying $3,895 in rent when there was testimony that at the end of the term the property could probably be rented for no more than $2,000 per month. In any event, we find no error by the trial court in failing to award lost rents during the entire time period of repair where Appellant made no attempt to rent the property during this period and there was unrefuted testimony that the premises were rentable upon surrender.

It is next argued that the trial court erred in failing to compensate the appellant for

the value of five infrared heaters that were removed by the appellee upon vacating the premises. Mr. Lunn testified that the heaters were attached to the rafters that connected to the electrical and natural gas lines. He confirmed that these were the only source of heat in the warehouse area and were installed prior to 1989. He removed the equipment because Boiler Supply was a "dealer" for these kind of heaters and, therefore, believed them a part of his company's equipment. Lunn stated that the heaters were used to allow Boiler Supply employees to work in specific areas of the warehouse and that these particular heaters were not designed to heat the entire warehouse area. He testified:

> The infrared heater, itself, is a focused heat that heats just a certain area. It's widely used in places where you either need spot heating or you have a large area heat that you don't want to heat the air, you just want to heat the surface that it strikes.

Mr. Oakley testified that the heaters were "removable." He described them as "suspended by chains, much like a certain type of light fixture . . . . [B]ut they were suspended from beams overhead by chains."

Boiler Supply argues that the trial judge obviously "misspoke" when he stated that the infrared heaters were "fixtures" that Boiler Supply was entitled to remove. Appellant contends that the trial court correctly ruled the items fixtures, but because they were placed on the premises prior to 1989, when the various other leases executed by the parties called for all fixtures placed on the premises by the lessee to become the property of the lessor at the expiration thereof, they rightfully belong to the appellant.

The court in *State ex rel. Comm'r v. Teasley*, 913 S.W.2d 175 (Tenn. App. 1995), defined the terms "fixture" and "trade fixture" as follows:

> *Black's Law Dictionary* defines the term "fixture" as "[a]n article in the nature of personal property which has been so annexed to the realty that it is regarded part of the land." "Trade fixture", on the other hand, is defined as "[p]ersonal property used by the tenant in business. Such fixtures retain the character of personal property . . . ."

*Teasley*, 913 S.W.2d at 177. The court further held:

> In Tennessee only those chattels are fixtures which are so attached to the freehold that, from the intention of the parties and the uses to which they are put, they are presumed to be permanently annexed, or a removal thereof would cause serious injury to the freehold. . . . The usual test is said to be the intention with which a chattel is connected with realty. If it is intended to be removable at the pleasure of the owner, it is not a fixture.

*Id*. at 177-78 (quoting *Memphis Housing Authority v. Memphis Steam Laundry-Cleaner, Inc.*, 463 S.W.2d 677, 679 (Tenn. 1971) (citations omitted)).

Considering the record, we do not find the five infrared heaters to be "fixtures" as herein defined. There was testimony that the heaters were used to "spot" heat certain areas of the warehouse in order that the Boiler Supply employees could work there. They did not heat the whole warehouse area and were suspended by chains. Mr. Oakley stated that they were removable and there was no testimony that upon such removal there was any damage to the freehold. Furthermore, Lunn testified that Boiler Supply was a dealer of the heaters. We do not believe the record supports a finding that the parties intended that they be permanently annexed to the property. Consequently, we hold that Boiler Supply was entitled to remove them upon vacating the property.

Finally, Appellant contends that its damage award was erroneously reduced by the trial court because of the acrimonious relationship of the parties who are family members. The record indicates that the trial court considered the family dynamics involved in this case. However, it does not suggest any over-emphasis by the trial court in this regard. We find the record to support the trial court's decision regarding damages and hold that any particular importance placed by the trial court on such family dynamics, if any, was harmless error.

We find no merit in the appellee's contention that Appellant is entitled to no award in excess of the two months holdover rent which was undisputably tendered to Appellant. It is asserted that because of the tender, Appellant is not entitled to an award of attorney's fees or court costs. The contract provides for an award of attorney's fees in the event of any breach, if successfully litigated. The trial court determined that the appellee was in breach of the agreement by failing to properly maintain the premises, a decision in which we have concurred. The case tried before the trial court was one for damages for breach of the lease in addition to the holdover rent.

We conclude that no error was committed by the trial court in this regard.

We deny Appellant's request for an additional award of attorney's fees incurred in this appeal. The judgment of the trial court is affirmed and this cause remanded for any further necessary proceedings. Costs are assessed against the appellant for which execution may issue if necessary.

_____
FARMER, J.


_____
CRAWFORD, P.J., W.S. (Concurs)


_____
TOMLIN, Sr. J. (Concurs)