# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

HENRY DANIEL ANDREWS,                      )
                                           )
              Plaintiff/Appellee,     ) Shelby Chancery No. 107152-1 R.D.
                                           )
VS.                                        ) Appeal No. 02A01-9708-CH-00202
                                           )
LUBRICON, L.P.,                            )
PROGRESSIVE CAPITAL                        )
INVESTMENT CORP.,                          )
and CRAMER ENTERPRISES, INC.,              )
                                           )
              Defendants/Appellants.  )

**FILED**

**July 30, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

APPEAL FROM THE CHANCERY COURT OF SHELBY COUNTY
AT MEMPHIS, TENNESSEE
THE HONORABLE NEAL SMALL, CHANCELLOR

**MICHAEL B. NEAL**
**KRIVCHER MAGIDS PLC**
Memphis, Tennessee
Attorney for Appellants

**RALPH D. GOLDEN**
**GOLDEN & MATHIS**
Memphis, Tennessee
Attorney for Appellee

**AFFIRMED**

              **ALAN E. HIGHERS, J.**

**CONCUR:**

**W. FRANK CRAWFORD, P.J., W.S.**

**HOLLY KIRBY LILLARD, J.**

      This appeal is taken from the judgment of the Shelby County Chancery Court which

held that the plaintiff was entitled to a judgment against the defendants for $263,636.71 arising from an unpaid debt obligation and unpaid consulting fees. After due consideration of the appeal, the Court affirms the ruling of the trial court.

## FACTS

The plaintiff Dan Andrews is a former retail store executive with over twenty years of experience. After leaving his job as the chief financial officer of major department store chain, Andrews became a consultant and an entrepreneur, investing in a variety of ventures. One such venture was The Marketing Group, L.P., a limited partnership organized to market products via televised "infomercials." In 1992, Andrews invested $10,000 in The Marketing Group and signed a $40,000 note on behalf of The Marketing Group to complete his $50,000 subscription. In 1993, The Marketing Group enjoyed strong sales in excess of $7.8 Million. However, despite the strong sales, The Marketing Group was losing money, and by the end of 1993, there was "substantial doubt" as to whether the partnership could continue as a going concern. That apprehension was reflected in the partnership's audited financial statements of 1992 and 1993.

The Marketing Group was owned by two general partners and a number of limited partners. The general partners were Cramer Enterprises, Inc., (hereinafter, "Cramer Enterprises") and Progressive Capital Investment Corporation (hereinafter, "Progressive"), an investment banking firm. Cramer owned 45 percent of The Marketing Group and served as the managing general partner, running the day-to-day operations. Progressive owed 5 percent of the shares of the partnership and served as the administrative general partner, raising capital for the partnership. The limited partners owned the remaining 50 percent of the outstanding shares of The Marketing Group. After a priority return of profits to the original investors, Cramer Enterprises received 45 percent of the profits of The Marketing Group, Progressive received 5 percent of the profits, and the remaining 50 percent of the profits were distributed to the limited partner investors. In addition to receiving 45 percent of the profits, Cramer Enterprises received 3 percent of the gross sales of The Marketing Group before any money was paid to investors or paid to creditors.

2

Andrews was hired by Cramer Enterprises in May, 1993, to be a consultant for The Marketing Group to help with a myriad of marketing, financial planning, operations and sales projects. Andrews was to be paid $5,000 per month for his services.

As previously noted, The Marketing Group enjoyed strong sales in 1993 and therefore needed to have large inventories of goods on hand. Being short on cash, the partnership enlisted the aid of a factoring company which permitted the partnership to turn over its accounts receivable in exchange for immediate credit. However, the factoring company required $500,000 in security, which The Marketing Group did not have. Therefore, in August 1993, Andrews agreed to loan $500,000 to The Marketing Group to pay to the factoring company. On August 11, 1993, and later on August 15, 1993, Andrews wrote two checks to The Marketing Group, totaling $500,000. Both checks bore the notation "Loan." There was no note executed between Andrews and The Marketing Group, but all parties agreed that Andrews loaned $500,000 to the partnership and that he became an unsecured creditor. In fact, the terms of the debt were noted in The Marketing Group's audited financial statement for 1992 and 1993. The audited financial statement provided in relevant part:

> The note payable represents $500,000 advanced by a limited partner to the Partnership in August, 1993. The note bears interest at 16%, is unsecured, and is due on demand. The related accrued interest due to the limited partner totaled $31,768 as of December 31, 1993.

Evidently, Andrews borrowed a portion of the money that he loaned to The Marketing Group.

In the Spring of 1994, The Marketing Group's sales had declined drastically. Therefore, the managing general partner, Cramer Enterprises, moved its operations from Atlanta, Georgia, to Progressive's offices in Memphis. Cramer Enterprises was owned by Michael Lynn, John Williams, Thomas Peters and Thomas Cramer. Thomas Cramer, the president and founder of Cramer Enterprises, left Cramer Enterprises at the time of the move, and his 35 percent of the outstanding shares of Cramer Enterprises reverted to the corporation's treasury. Lynn, Williams and Peters were also the shareholders of

3

Progressive. Therefore, as of the Spring of 1994, both of The Marketing Group's general partners, Progressive and Cramer, were operating out of the same offices in Memphis.

In June, 1994, The Marketing Group paid Andrews $387,000 as partial repayment on the outstanding debt. In October, 1994, Andrews loaned the partnership an additional $36,000, and in February, 1995, the partnership repaid Andrews an additional $48,000, leaving an outstanding balance due to Andrews on the note of $101,000. In the Spring of 1995, Andrews told the shareholders of The Marketing Group that he was owed approximately $300,000 in unpaid debt plus interest and unpaid consulting fees. Andrews had been paid for his consulting services for only two months prior to May 1995, though after that time, he was paid for the 11 months he remained from May 1995, until his departure in March 1996. In all, Andrews was paid for only 13 of the 35 months he worked as a consultant to The Marketing Group. Though not the subject of the instant suit, The Marketing Group also owed Progressive approximately $440,000, which Progressive had borrowed on the partnership's behalf from the National Bank of Commerce in Memphis.

It was readily evident to the shareholders of The Marketing Group that the only hope of repaying the debts and salvaging the business was to generate sales. Projections prepared by Andrews and others indicated that annual sales of $30,000,000 were possible through sales of a new product named "Engine Ice," and around that time, The Marketing Group changed its name to "Lubricon, L.P." to reflect its new direction. However, the fiscal problems remained. Had the projected, though unprecedented sales of $30 million materialized, Cramer Enterprises could have realized at least $900,000 annually due to its right to 3 percent of The Marketing Group/Lubricon's gross sales.

On May 19, 1995, Cramer Enterprises held a shareholders meeting. Prior to the meeting, Cramer's ownership was as follows: John Williams, 35 percent; Michael Lynn, 7.5 percent; and Thomas Peters, 22.5 percent. The remaining 35 percent previously owned by Thomas Cramer had been promised to Dan Andrews in the amount of 20 percent and to Pat Adams in the amount of 15 percent, though Peters testified that the shares were "not

4

really issued" to either Andrews or Adams. Included among the items on the agenda was the $300,000 in unpaid debt and compensation owed to Andrews. The minutes of the May 19, 1995, meeting indicate that an agreement was reached to repay Lubricon's debts to both Andrews and Progressive. The minutes of the shareholder's meeting constitute the only written document memorializing the parties' agreement and intentions regarding the repayment of the debt owed to Andrews. The relevant portions of the minutes written by the corporate secretary, D. Patterson ("Pat") Adams are set forth below:

> A meeting of the Cramer Enterprises stockholders was held at the offices of The Memphis Group in Memphis, Tennessee, pursuant to notice duly given. In attendance were stockholders S. Thomas Peters, C. Michael Lynn and John Williams; guests were Dan Andrews and Patterson Adams.
> .....
>
> The next order of business was to address the approximate $300,000 owed to Dan Andrews and the equity split that had previously been promised to Mr. Andrews and Mr. Adams. When Mr. Cramer was terminated from the Company, his 35 percent equity in the company was promised 20 percent to Dan Andrews and 15 percent to Pat Adams. Since that time, Mr. Andrews has continued to serve as consultant to the Company. Although the Company has not paid its consulting fees, it has been covering his expenses since he moved to Memphis in May 1994. Various mechanisms were discussed for how to handle the equity ownership and the payout of profits, if any, versus the funds owed by Progressive Capital and the funds owed by Dan Andrews. It was ultimately agreed that the Company would pay back the loans to Progressive Capital and to Dan Andrews (if and when funds were available) on a percentage basis with 40½ percent of the allotted funds going to Mr. Andrews for his debt reduction and 59½ percent going to Progressive Capital for its debt reduction.
>
> It was suggested the equity between Mr. Andrews and the other shareholders be split also on an equal basis for what was owed versus what was originally projected. Mr. Peters questioned this 40½ percent split for Dan Andrews, 15 percent split for Pat Adams, and the balance for the Progressive Capital entities. (Mr. Lynn, Mr. Peters and Mr. Williams had agreed to transfer their Cramer Enterprise stock to Progressive Capital previously.) After some discussion, Mr. Adams offered to forego taking any equity in the Company. It was agreed that the equity in Cramer Enterprises would be split 40½ percent to Dan Andrews and 59½ percent to Progressive Capital.
>
> Mr. Andrews agreed to continue working as a consultant for 90 days and the shareholders agreed to cover his expenses (up to $2,000/month) during this 90-day period. The shareholders agreed to meet again in 60 days to review progress.

The minutes were signed by S. Thomas Peters, C. Michael Lynn, John Williams, Daniel Andrews and D. Patterson Adams.

5

Cramer Enterprises was entitled to receive 3 percent of gross sales of the partnership before any other distribution was made. Therefore, Andrews would have been entitled to receive 40½ percent of 3 percent of Lubricon's gross sales. As Andrews testified at trial,

> I felt I was owed $300,000, and I wanted -- if The Marketing Group was going to continue doing business and if -- if -- if it worked out that we were successful, I didn't want to -- money going to Cramer Enterprises with me still having a note sitting over in Lubricon unpaid.
>
> What I was looking for was any way I could get cash or a proportion of cash to get my notes paid because I was getting pressure from the banks about right then.

On cross-examination, Andrews testified.

> But all I want is cash flow to reduce my note. If part of the cash flow comes from The Marketing Group and part of it comes from Cramer Enterprises, what do I care? Cash flow is cash flow.

Lubricon never had any substantial sales, though Andrews worked for 10 more months in an effort to build the business. At trial, the defendants' witness Thomas Peters testified that Andrews was not issued the stock in Cramer Enterprises that was promised to him at the May 19 meeting. Nonetheless, from May, 1995, until March, 1996, when Andrews left Lubricon, he was paid $5,000 per month in consulting fees.

On March 15, 1996, Andrews filed suit against Lubricon, Progressive and Cramer Enterprises for the accrued and unpaid debt, consulting fees and interest that was due to him. The defendants filed an answer in which they denied that any funds were due and payable to Andrews because he had subordinated his debt in exchange for 40½ percent of the outstanding shares of Cramer Enterprises.

The trial court entered an Order for Default Judgment for $358,644.25 against Cramer Enterprises on September 13, 1996. This cause came to trial on June 5, 1997. Following a hearing on the matter, the Chancellor ruled from the bench in favor of the

plaintiff Andrews against defendants Lubricon and Progressive. On July 25, 1997, the trial court entered a Judgment against the defendants for $263,636.71, which included $101,000 for the outstanding loan balance, $110,000 in unpaid consulting fees and $52,636.71 in interest on the loan at 7 percent annually. The defendants timely filed a notice of appeal on August 21, 1998, and the cause is properly before this Court for consideration.

Since this matter was heard before the court sitting without a jury, review of the findings of fact shall be *de novo* upon the record, accompanied by a presumption of the correctness of the findings. Rule 13(d) Tenn.R.App.P. Unless the evidence preponderates against the findings, the Court must affirm, absent error of law.

## ANALYSIS

On appeal, the defendants assert that Andrews subordinated, settled, novated or otherwise released the debt owed to him in exchange for 40½ percent of the shares of Cramer Enterprises. Therefore, the defendants maintain that Andrews is estopped from demanding payment from Progressive and Lubricon. We disagree. The theories of release and subordination propounded by the defendants are not supported by the facts of this case.

Releases are valid in Tennessee and are not against public policy. Dixon v. Manier, 545 S.W.2d 948 (Tenn. App. 1976). A release is a contract, and the rules of construction applied to contracts are used in construing a release. Richland Country Club, Inc. v. CRC Equities, Inc., 832 S.W.2d 554, 557 (Tenn. App. 1991). Therefore, the task of the courts is to ascertain the intention of the parties. To determine the parties' intent, we first look to the material contained within the four corners of the document itself. Words or phrases contained in the instrument are to be given their ordinary and usual meaning, unless otherwise expressly provided. Rogers v. First Tennessee Bank Nat'l Assn., 738 S.W.2d 635, 637 (Tenn. App. 1987); Jaffe v. Bolton, 817 S.W.2d 19, 25 (Tenn. App. 1991). In determining whether the meaning of the contract is clear or ambiguous, the language in

7

dispute must be examined in context of the entire agreement. Gredig v. Tenn. Farmers Mut. Ins. Co., 891 S.W.2d 909, 912 (Tenn. App. 1994). If the language of the contract is clear and unambiguous, it must be construed as written. Cummings v. Vaughn, 911 S.W.2d 739, 742 (Tenn. App. 1995). In such case, neither party is to be favored when construing the contract. Heyer-Jordan & Assoc., Inc. v. Jordan, 801 S.W.2d 814, 821 (Tenn. App. 1990). The language of the contract is said to be ambiguous when its meaning is uncertain and when it can be fairly construed in more than one way. Gredig, 891 S.W.2d at 912. If the contract is determined ambiguous, we are to determine the intention of the parties not only from the language but also from the surrounding facts and circumstances. HMF Trust v. Bankers Trust Co., 827 S.W.2d 296, 299 (Tenn. App. 1991).

The scope and extent of a release depends on the intent of the parties as expressed in the instrument. Cross v. Earls, 517 S.W.2d 751, 753 (Tenn. 1974). As this Court noted in a recent opinion, Burks v. Belz-Wilson Properties, 958 S.W.2d 773, 776 (Tenn. App. 1997),

> In interpreting a release to determine whether a particular claim has been discharged, the primary rule of construction is that the intention of the parties shall govern, and this intention is to be determined with a consideration of what was within the contemplation of the parties when the release was executed, which in turn is to be resolved in the light of all of the surrounding facts and circumstances under which the parties acted. Id. at 776, citing Jackson v. Miller, 776 S.W.2d 115 (Tenn. App. 1989).

Central to this case is the interpretation of the minutes of the May 19, 1995, Cramer Enterprises shareholders meeting. The minutes recite that the shareholders present were Peters, Lynn and Williams. The minutes further state that Andrews and Adams attended the meeting as guests. As previously noted, when Thomas Cramer left Cramer Enterprises, his 35 percent of the outstanding shares reverted to Cramer Enterprises' treasury. Of the 35 percent formerly owned by Cramer, 20 percent had been promised to Andrews and 15 percent had been promised to Adams; however, the shares had not been delivered to either. Andrews testified:

> Q. You have a -- you had acquired or owned 20 percent of Cramer at that point.

8

A. Supposedly, but it never happened.

Q. All right. Well, I'm -- I'm going to talk about what -- another agreement that's made after that. But you owned --

A. My understanding is I owned 20 percent but I had no proof.
.......
Q. ....Now, you had previously been promised 20 percent, right?

A. And that never happened.


The parties understood that The Marketing Group owed Andrews approximately $300,000. Furthermore, the defendants understood that both Cramer Enterprises and Progressive, The Marketing Group's general partners, were liable for the partnership's debts. Thomas Peters, the president of Cramer Enterprises and a shareholder of both Cramer Enterprises and of Progressive testified:

> Q. Mr. Peters, isn't it true that under the terms of the limited partnership that the two general partners -- that is Progressive Capital and Cramer -- are responsible for the obligations of the limited partnership?
>
> A. Yes, they are.


Because Cramer Enterprises was entitled to 3 percent of the gross sales of The Marketing Group/Lubricon, the parties understood that it was beneficial for both Andrews and Progressive to be paid Cramer's share of the proceeds in order to generate cash flow so that Andrews and Progressive could repay their debts. As Andrews testified:

> A. ....And the reason that this meeting occurred was that Cramer, Incorporated, received its money right off the top, as he said earlier, of any sales that would happen within The Marketing Group.
>
> In other words, if The Marketing Group made a million dollars worth of sales, 3 percent at this point in time would come right off the top, roughly in whatever dollar amount that is, and go straight to Cramer Enterprises. I felt that I was owed $300,000, and I wanted -- if The Marketing Group was going to continue doing business and if -- if -- if it worked out that we were successful, I didn't want to -- money going to Cramer Enterprises with me still having a note sitting over in Lubricon unpaid.
>
> What I was looking for was any way I could get cash or a proportion of cash to get my notes paid because I was getting pressure from the banks about right then.

Likewise on cross-examination Andrews testified:

> A. So -- and all I'm interested in is getting my money back. And I don't care how, if you will remember, I got it back. But I couldn't see the money being diverted to another company that had no expenses and me not sharing with it. I mean, I was the largest creditor.
> ......
>
> But all I want is cash flow to reduce my note. If part of the cash flow comes from The Marketing Group and part of it comes from Cramer Enterprises, what do I care? Cash flow is cash flow.

Obviously, Andrews and the defendants in this cause have different positions regarding the purpose and intent of the agreement reached at the Cramer Enterprises shareholders meeting on May 19, 1995. As previously stated, Andrews maintained that the purpose of the agreement was to provide cash flow to him in the event that Lubricon had sales because he stood to benefit from his share of Cramer Enterprises' rights to 3 percent of Lubricon's gross sales. It should be remembered that Progressive, which was owned by the same shareholders as owned Cramer Enterprises, also stood to benefit from the same arrangement to which Andrews had testified. Andrews asserts that the debt was to be discharged from the cash flow, if and when there was cash flow. Therefore, Andrews wanted to obtain a share of Cramer Enterprises' rights to the proceeds of the partnership.

Conversely, the defendants maintain that under the agreement, Andrews subordinated the outstanding debt in exchange for an equity interest in Cramer Enterprises. The defendants maintain that the 40½ percent equity interest in Cramer Enterprises and the corresponding entitlement to a share of the gross profits of Lubricon was not simply a way to pay the debt, but, instead, was consideration for Andrews' agreement to subordinate the debt. The defendants aver that the cash flow was not designed to pay Andrews' debt, but rather, to push his debt behind that of every other creditor. Defendants assert that until Lubricon repaid all of its other creditors, Lubricon would still be liable for its debt to Andrews. In the meantime, Andrews would benefit by getting cash from his 40½ percent interest in Cramer Enterprises. Simply stated, the defendants maintain that Andrews subordinated his debt in exchange for an equity interest

10

in Cramer Enterprises and the hope of making money in excess of the repayment amount. While Andrews' gamble did not pay off, the defendants maintain that he is entitled to his 40½ percent equity interest in an otherwise worthless company.

The defendants assert that evidence of the subordination agreement is found in the phrase "if and when funds were available" contained in the minutes of the May 19 shareholders meeting. The minutes state in relevant part:

> It was ultimately agreed that the Company would pay back the loans to Progressive Capital and to Dan Andrews (<u>if and when funds were available</u>) on a percentage basis with 40½ percent of the allotted funds going to Mr. Andrews for his debt reduction and 59½ percent going to Progressive Capital for its debt reduction.
> (Emphasis Added)

We find that the phrase "if and when funds were available" does nothing more than to establish a timing provision of when the money would be disbursed. As noted in the audited financial statement of 1992 and 1993, Andrews held a note payable on demand. It appears that by agreeing to accept repayment from the cash flow of Cramer "if and when funds were available" instead of demanding immediate repayment, Andrews acquired an equity interest in Cramer Enterprises from which he would obtain cash flow to repay his debts. The contested phrase is no different than the "pay as paid" clauses found in construction contracts. <u>Koch v. Construction Technology, Inc.</u>, 924 S.W.2d 68, 71-72 (Tenn. 1996). By analogy, we do not find that such language is sufficient to subordinate a debt in the absence of contract language that clearly indicates that the parties intended to do so.

In analyzing the release and subordination issue, we find Pat Adams' testimony regarding the purpose and intent of the parties to be compelling. Adams was the corporate secretary of Cramer Enterprises, and in that capacity, he attended the May 19 shareholders meeting and transcribed the minutes from that meeting that are at issue in this lawsuit. Adams was not a shareholder of Cramer Enterprises, though he agreed at the May 19 meeting to forego the 15 percent equity interest in Cramer Enterprises that he had been promised. Adams, a witness called by the defense, testified that he had no bias

11

against or preferred interest in either of the parties. On direct examination, Adams testified:

> Q. All right. Was an agreement reached as to when and on what terms Mr. Andrews was going to be repaid monies at that point?
>
> A. Yes.
>
> Q. What was that agreement?
>
> A. Both Dan (Andrews) and Progressive Capital had monies owed to them that had been put in the partnership (The Marketing Group/Lubricon) to sustain it, just to keep it open, in trying to sell the engine ice product. There was a percentage based on if the company could generate some profits in selling the engine ice product or anything else that they had....
>
> And if profits were generated off that, then how those profits would be split to satisfy both Dan's outstanding debts and Progressive Capital's.
>
> ......
>
> Q. Did Mr. Andrews agree to forgo payment of his $300,000 at this meeting in exchange for anything?
>
> A. What Mr. Andrews agreed to at this meeting was that the only source of payment that we could identify was making The Marketing Group profitable and that there was an opportunity to do that.
>
> And the debt of several hundred thousand that Progressive had put into the company, and debt or back consulting fees or whatever else there may have been that was the cumulative amount that Dan was owed for what he had put into the company, would be repaid coming out of profits from this company.

On cross-examination, Adams testified:

> Q. And Progressive Capital didn't have any money at the time, and The Marketing Group probably didn't have any money at that time. And you were talking about making payments from the profits. That would have been the natural funds to use to pay any debt.
>
> A. Mm-hum.
>
> Q. Isn't that true?
>
> A. Yes.
>
> Q. I mean, if you didn't have profits, you weren't going to pay anybody?
>
> A. That's correct.

12

> Q.  So basically what this agreement was doing as far as Cramer was to figure out a way to pay back the debts on a plan so that Progressive could be paid its loan and Dan could be paid his loan.
>
> A.  That's correct.
>
> Q.  And nobody was forgiving any debts against anybody; isn't that true?
>
> A.  That's correct.

Likewise, Thomas Peters, a shareholder of both Cramer Enterprises and Progressive testified that the agreement memorialized in the minutes of the May 19 meeting did not expressly release Progressive Capital of its obligations to Andrews, though he asserted that such was the intent.  He stated:

> Q.  Well, but what I'm saying in black and white, Mr. Peters, there's nothing in Exhibit Number 4, I believe, or the minutes of May the 19th, 1995, that releases Progressive Capital in plain and simple language of its obligations to Mr. Andrews, is there?
>
> A.  In plain simple language, no.

The Court does not find that the language of the minutes can be interpreted as changing Andrews' creditor/debtor relationship with the defendants.  In light of the foregoing rules of construction and proof introduced at trial, we find that the agreement memorialized in the minutes of the May 19 Cramer Enterprises shareholders meeting does not constitute an agreement by Andrews to subordinate or otherwise to release the debt owed to him in exchange for an equity interest in Cramer Enterprises.

The debt obligation due to Andrews was due on demand, and in exchange for Andrews' agreement to accept repayment "if and when funds were available," the signatories of the minutes of the Cramer Enterprises May 19 shareholders' meeting promised Andrews a 40½ percent equity interest in Cramer Enterprises in order to give him access to a ready source of cash flow to pay his debts.  In fact, the defendants never delivered on their promise to make Andrews a shareholder because he was never issued stock nor afforded any other benefits of stock ownership.

13

After consideration of the record, the briefs on appeal and the argument of the parties, it appears that the agreement memorialized by the minutes of the May 19 shareholder's meeting was simply an attempt to provide Lubricon's principal creditors with cash flow in order to repay their own obligations. Accordingly, we find that the agreement memorialized by the May 19 minutes does not constitute a subordination, settlement, release or novation of any obligation existing between The Marketing Group/Lubricon and Andrews. For the foregoing reasons, we affirm the ruling of the trial court. All other issues raised by the parties are pretermitted by this ruling. Costs are adjudged against appellants.

_____

HIGHERS, J.

CONCUR:

_____

CRAWFORD, P.J., W.S.

_____

LILLARD, J.