IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 13, 2002 Session

## DURNELCO, INC. v. DOUBLE JAMES, L.L.C.

Appeal from the Chancery Court for Hamilton County
No. 00-1358     W. Frank Brown, III, Chancellor

FILED JUNE 26, 2002

No. E2001-02010-COA-R3-CV

This case involves the interpretation of a commercial lease agreement. The tenant, Durnelco, Inc. ("Durnelco"), filed a complaint for declaratory judgment, seeking a declaration that it properly terminated the lease agreement on July 31, 2000. Durnelco also asked that it be permitted to remove, at its expense, certain improvements made by it to the leasehold premises, including some flooring, walls, doors, windows, bathroom fixtures, and exterior decking. The present landlord, Double James, LLC ("Double James"), answered and filed a counterclaim asserting that Durnelco had breached the lease and had refused to surrender possession of the premises. It sought damages as a result of Durnelco's alleged holdover tenancy. The trial court allowed Durnelco to remove only two signs and certain light fixtures. The court awarded Double James $7,000 in rent for the period of July through December, 2000. Durnelco appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

F. Scott LeRoy and C. Ballard Scearce, Jr., Chattanooga, for the appellant, Durnelco, Inc.

Arthur C. Grisham, Chattanooga, for the appellee, Double James, LLC.

**OPINION**

I.

On February 19, 1997, Durnelco entered into a commercial lease agreement with Island Cove Marina and Resort, L.L.C. ("Island Cove"). The leasehold property is a restaurant facility located at a marina in Harrison. Beginning in March, 1997, Durnelco, at its expense, made extensive renovations to the property, intending to upgrade and improve the restaurant. Durnelco opened its restaurant, called the "Durty Parrot Pub," on June 9, 1997. Dennis Brady, the president of Durnelco,

testified that the Durty Parrot Pub operated continuously until January 1, 1998, then closed for the winter, and later reopened in mid-April of 1998.

Island Cove filed for bankruptcy on September 14, 1998. Brady testified that "the bottom fell out" and the restaurant's receipts dropped by fifty percent after the bankruptcy filing. The restaurant closed at the end of 1998, reopened "on a limited basis" for the summer of 1999, and closed for good in September, 1999.

On May 9, 2000, Island Cove filed a "complaint for turnover of property and for declaratory judgment" against Durnelco in bankruptcy court, which alleged, in part, as follows:

> Durnelco ... has refused to operate a restaurant on the premises as called for by the lease agreement. Durnelco ... has similarly refused to surrender the Leased Premises to [Island Cove] so that [Island Cove] could obtain a substitute lessee willing to operate a restaurant as called for under the lease agreement.

Island Cove asked the court to declare that Durnelco was in breach of the lease and to order Durnelco to turn over possession of the property to it.

Island Cove sold substantially all of its interest in the marina property – including the lease with Durnelco – to Double James on June 15, 2000. On July 25, 2000, counsel for Double James sent a letter to Durnelco that purported to terminate the lease for an uncured failure to pay the July, 2000, rent. On July 31, 2000, counsel for Durnelco sent a letter to Double James asserting that Durnelco was terminating the lease pursuant to Article XXXIV(f) of that document, which provides that Durnelco had the right to terminate the agreement if Island Cove sold "substantially all of its assets" during the initial five-year leasehold term.

On August 7, 2000, the bankruptcy court entered an order allowing Double James to intervene as a party plaintiff. On October 17, 2000, the bankruptcy court filed a memorandum opinion rejecting Island Cove's contention that the lease required Durnelco to continuously operate a restaurant on the premises except for the 90-day shutdown period specifically provided for in the lease. The court found that Durnelco had not breached the lease with regard to the "continuous operation" issue.

Double James then filed a motion with the bankruptcy court stating that "any further matters in controversy between [Double James and Durnelco] with respect to the commercial lease agreement ... should be adjudicated in a state forum of appropriate jurisdiction" and requesting that the court "abstain from any further action with respect to the controversies between Double James and Durnelco." The court granted this motion by order entered November 15, 2000.

Durnelco filed its complaint in the instant action on December 14, 2000, seeking, among other things, that the court "declare the rights of the parties under the Lease ... specifically with

regard to the ownership interest in the trade fixtures, equipment and other improvements installed in the premises by Durnelco." Double James filed an answer and counterclaim seeking unpaid rent and damages resulting from Durnelco's alleged failure to surrender possession of the premises.

Following a bench trial, the court below ruled that Durnelco had timely cured its default with respect to the payment of rent for July, 2000, by mailing a $2,000 check on July 25, 2000. The court found that Durnelco properly terminated the lease pursuant to Article XXXIV(f) on July 31, 2000. The court awarded Durnelco possession of

> the two Durty Parrot signs, deck lighting, track lighting and banquet room chandeliers located on the premises ... provided, however, those items are to be removed without damage to the premises and that the chandeliers, if removed, are to be replaced with fixtures similar to those in the premises at the time of the signing of the lease.

The court refused to award Durnelco possession of the other improvements sought by it. The court awarded Double James $7,000 in rent.

Durnelco appeals, raising the following issues for our consideration and resolution: (1) whether the trial court erred in denying Durnelco's request to remove its fixtures, equipment, and tenant alterations and improvements pursuant to the terms of the lease; (2) whether the court erred in holding that Durnelco could not recover the value of its improvements and alterations on a theory of unjust enrichment; and (3) whether the court erred in awarding Double James $7,000 in damages for rental payments due for certain months subsequent to Durnelco's termination of the lease.

## II.

In this non-jury case, our review is *de novo* upon the record, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn.1993); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn.1995). The trial court's conclusions of law, however, are accorded no such presumption. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn.1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn.1993).

## III.

Shortly after Durnelco and Island Cove signed the lease, Durnelco contracted with a construction firm to make extensive renovations to the premises. The renovations involved the removal and replacement of certain floors and non-load bearing walls; the installation of new fixtures and kitchen appliances; and the repair or improvement of the HVAC, plumbing, and electrical systems of the building . New doors and windows were installed and an outside deck was torn down and replaced with a new deck. Brady testified that the cost of all of this work was $205,211.42.

Shortly after it terminated the lease, Durnelco advised Double James of its intent to remove the improvements it had made to the property. As Durnelco states in its brief,

> Durnelco sought to remove items such as the decks, the doors, the hardwood flooring, the plumbing fixtures, the mechanical duct work, the tongue and groove paneling, the signs, the lighting fixtures, the built up/raised eating areas, washable wallboard, steel doors and other non structural items. Durnelco did not seek to **remove** any item which was of a structural nature, such as floor joists, load bearing walls, or rafters or for that matter electrical, plumbing and/or HVAC wires.

(Bold and underlining in original). Brady testified that it was his intention to remove "[b]asically everything short of pulling the wiring out or removing the plumbing pipes."

Durnelco cited Article X of the lease in support of its contention that it has the right to remove the improvements. Article X of the lease states, in relevant part:

> Tenant shall have the right, at its sole expense, from time to time, to make such replacements, alterations and additions, (hereinafter in this section called "alterations") to the nonstructural elements of the Demised Premises as Tenant shall deem expedient or necessary for its purposes; provided, however, that such alterations shall neither impair the structural soundness of the building nor diminish the value of the Demised Premises. Tenant may make alterations to the structural elements of the Demised Premises provided Tenant has first obtained the consent thereto of Landlord in writing; Landlord agreeing that it shall not withhold such consent unreasonably .... *Tenant shall have the right to remove any alteration or addition made by it at the termination of this Lease so long as the removal does not effect [sic] the structural element of the Demised Premises.*

(Emphasis added). Durnelco argues on appeal that the trial court erred in refusing to allow it to remove the improvements.

We initially note that it is apparent from the record that the items at issue here are not trade fixtures or easily removable restaurant equipment. The removal of trade fixtures is controlled by Article XI of the lease, which states in relevant part:

> Except in an event of uncured default, fixtures and other equipment installed in the Demised Premises by Tenant at its own expense at any time or times either prior to or during the Initial Leasehold Term o[r] any Renewal Term or terms of this Lease, shall belong to and be

-4-

the property of Tenant. Tenant shall have the right to remove all restaurant equipment ... during and at the end of any such term, provided Tenant shall repair all physical damage to the premises caused by such removal.

\* \* \*

Tenant's trade fixtures and other equipment shall be and remain personal property and shall not be deemed to be fixtures nor part of the Premises.

A public auction took place at the subject property on August 24, 2000. The auctioneer, Kenneth Gravitt, testified that he was hired to "conduct a public auction of all furniture, fixtures and equipment located at Island Cove Marina." Gravitt stated that he sold the readily removable items and that he did not "think [he] sold anything that was not a trade fixture." Durnelco received the net proceeds from the auction. Neither party has raised any issue regarding the propriety of the auction or the disposition of the net proceeds.

As reflected above, Article X of the lease allows Durnelco to remove any "alteration or addition ... so long as the removal does not [a]ffect the structural element of the Demised Premises." The term "structural element" is not defined in the lease.

We interpret the provisions of the lease at issue in accordance with the following well-defined principles of contract interpretation.

> Interpretation of a written contract is a matter of law, rather than a matter of fact. *See **Hamblen County v. City of Morristown***, 656 S.W.2d 331, 335-36 (Tenn. 1983); ***Standard Fire Ins. v. Chester O'Donley & Assocs., Inc.***, 972 S.W.2d 1, 5-6 (Tenn. Ct. App. 1998). The purpose of interpreting a written contract is to ascertain and to give effect to the contracting parties' intentions. *See **Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.***, 521 S.W.2d 578, 580 (Tenn. 1975); ***Gredig v. Tennessee Farmers Mut. Ins. Co.***, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994). In the case of written contracts, these intentions are reflected in the contract itself. Thus, the search for the contracting parties' intent should focus on the four corners of the contract, *see **Whitehaven Community Baptist Church v. Holloway***, 973 S.W.2d 592, 596 (Tenn. 1998); ***Hall v. Jeffers***, 767 S.W.2d 654, 657-58 (Tenn. Ct. App. 1988), and the circumstances in which the contract was made. *See **Penske Truck Leasing Co. v. Huddleston***, 795 S.W.2d 669, 671 (Tenn. 1990); ***Pinson & Assocs. Ins. Agency, Inc. v. Kreal***, 800 S.W.2d 486, 487 (Tenn. Ct. App. 1990).

In the absence of fraud or mistake, courts should construe contracts as written. *See **Frank Rudy Heirs Assocs. v. Sholodge, Inc**.*, 967 S.W.2d 810, 814 (Tenn. Ct. App. 1997); ***Whaley v. Underwood***, 922 S.W.2d 110, 112 (Tenn. Ct. App. 1995). The courts should accord contractual terms their natural and ordinary meaning, *see **Evco Corp. v. Ross***, 528 S.W.2d 20, 23 (Tenn. 1975), and should construe them in the context of the entire contract. *See **Wilson v. Moore***, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996); ***Rainey v. Stansell***, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992). The courts should also avoid strained constructions that create ambiguities where none exist. *See **Hillsboro Plaza Enters. v. Moon***, 860 S.W.2d 45, 47-48 (Tenn. Ct. App. 1993).

The courts may not make a new contract for parties who have spoken for themselves, *see **Petty v. Sloan***, 197 Tenn. 630, 640, 277 S.W.2d 355, 359 (1955), and may not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise. *See **Atkins v. Kirkpatrick***, 823 S.W.2d 547, 553 (Tenn. Ct. App. 1991). Thus, when called upon to interpret a contract, the courts may not favor either party. *See **Heyer-Jordan & Assocs., Inc. v. Jordan***, 801 S.W.2d 814, 821 (Tenn. Ct. App. 1990). However, when a contract contains ambiguous or vague provisions, these provisions will be construed against the party responsible for drafting them. *See **Hanover Ins. Co. v. Haney***, 221 Tenn. 148, 153-54, 425 S.W.2d 590, 592-93 (1968); ***Burks v. Belz-Wilson Properties***, 958 S.W.2d 773, 777 (Tenn. Ct. App. 1997).

***Realty Shop, Inc.  v.  RR Westminster Holding, Inc.***, 7 S.W.3d 581, 597-98 (Tenn. Ct. App. 1999).

Durnelco argues that the term "structural element" in the lease is synonymous with "structural soundness" or "structural integrity." Thus, so the argument goes, the parties intended that Durnelco would essentially be allowed to remove any item from the restaurant property so long as the removal allowed the building to remain standing and structurally sound. Double James urges a broader construction, arguing that removal of such items as the exterior deck, floor boards, and wall coverings would "affect" the "structural element," according to the natural and ordinary meaning of those words.

At trial, Durnelco presented the testimony of Wesley Jarrett, the job supervisor for the contractor that Durnelco hired to do the remodeling work on the property. Jarrett testified as follows regarding the terms at issue here:

Q: During your twenty years in the construction business and attending all these schools that you have attended, could you tell us whether or not the term "structural element" has any particular specialized defined meaning in the construction industry? Is that a term of art?

A: Not one that I'm aware of. There is structural components, but they have a definite category.

Q: Does structural integrity have any particular---

A: Sure.

Q: What is structural integrity? Something that would adversely affect structural integrity, what would that be, for example?

A: Lack of bracing, lack of adequate roofing, lack of adequate flooring, lack of adequate insulation. That list goes forever.

Q: Okay. Structural soundness, would that be a similar type phrase to structural integrity?

A: Sure.

Q: What does the phrase structural element mean to you?

A: Structural components, I guess.

Q: Would you just tell me what are the structural elements of a restaurant, what would that include?

A: Floor, walls, ceiling, roof, beams, pillars.

Q: Would it include such things as stuff to hold walls and roofs and ceilings and floors together?

A: Sure, nails.

Q: Nails?

A: Nails.

Q: Caulking?

A: Caulking.

Q: Glue?

A: Glue.

Jarrett testified on cross-examination that, in his opinion, the replaced wall coverings and paneling, the indoor-outdoor bar, the attached lighting, and the venting ducts were part of the building's "structural element." He stated that removal of the pine tongue-and-groove flooring, which was nailed down, would possibly "tear up chunks of the subfloor," which would affect the structure of the building. Jarrett testified that removing the exterior deck would "affect the structural element of that side of the building that you take it off of."

The language of a contract is ambiguous when it is "susceptible of more than one reasonable interpretation." *Memphis Housing Authority v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001). We find and hold, based upon the record before us, that the meaning of the words "structural element," as used in the subject lease, is ambiguous. It is well-settled that "Tennessee law ... requires that ambiguous terms in a lease be construed against the drafter of the instrument." *Id.* at 513; *Realty Shop, Inc*., 7 S.W.3d at 598; *Vantage Technology, LLC v. Cross*, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999).

The pivotal sentence in the lease – which states that "[t]enant shall have the right to remove any alteration or addition made by it at the termination of this Lease so long as the removal does not [a]ffect the structural element of the Demised Premises" – was drafted and inserted in the lease by Durnelco. Durnelco could have unambiguously defined "structural element" in the lease if it desired the right to the extraordinary remedy that it now seeks. In other words, it could have clearly reserved for itself the right to remove the specific items that it now seeks to remove by judicial fiat. Accordingly, we adopt the meaning urged by Double James with respect to the words "structural element" and hold that the removal of the leasehold improvements, as sought by Durnelco, would "affect" the "structural element" of the premises. It follows that Article X of the lease does not give Durnelco the right to remove these improvements and alterations.

As the trial court noted, Article XXII of the lease contains the following pertinent requirement:

> At the expiration of this Lease, Tenant shall surrender the Demised Premises in the same condition as it was in upon delivery of possession thereto under this Lease, reasonable wear and tear excepted[.]

The evidence shows that immediately prior to the signing of the lease, the leasehold property was a functioning restaurant. Brady testified that in his opinion the building required significant upgrades; but it had functioning doors, windows, bathroom fixtures, and a deck of substantially the

-8-

same size. The walls and floors were finished. In his testimony, Brady proposed to cover the walls, floors, and door and window openings with low-grade plywood after the removal of the improvements sought by Durnelco. Durnelco seeks to completely remove the deck and bathroom fixtures, notwithstanding the existence of such items in the restaurant at the time of delivery of possession.

Jarrett testified that, although it would be impossible to return the premises to precisely the same condition prior to the renovations, a reasonable attempt to do so would cost approximately $100,000. A reasonable reading of the entire language of the lease, including the requirement of Article XXII, compels the conclusion that the parties did not intend the approach suggested by Durnelco. We affirm the trial court's judgment finding that the terms of the lease do not give Durnelco the right to remove the leasehold improvements.

## IV.

Durnelco argues that the trial court erred in holding that it could not recover the value of its improvements and alterations on a theory of unjust enrichment. As the Tennessee Supreme Court has pointed out,

> [u]njust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist. ***Paschall's Inc. v. Dozier***, 219 Tenn. 45, 407 S.W.2d 150, 154-55 (1966). Courts will impose a contractual obligation under an unjust enrichment theory when: (1) there is no contract between the parties or a contract has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation. ***Id.*** 407 S.W.2d at 154-55.

***Whitehaven Community Baptist Church v. Holloway***, 973 S.W.2d 592, 596 (Tenn. 1998). The first requirement is not satisfied here; the lease is a written contract covering the subject matter at issue. Further, it is not at all clear from the record that Double James has been unjustly enriched by the various transactions and occurrences since the signing of the lease. We affirm the trial court's judgment on the unjust enrichment issue.

## V.

Durnelco challenges the trial court's judgment awarding Double James $7,000 in rent, which the trial court held included the following elements:

> consisting of $2,000.00 rent for the month of July, 2000, and $5,000 for rent covering the period August 1, 2000 through the date on which Double James changed the locks and took possession of the property on or about December, 2000.

Double James argues that after Durnelco's termination of the lease, the latter refused to surrender possession of the premises and thus became a holdover tenant. Durnelco denies that it refused to surrender possession.

The essence of the testimony in the record suggests that after the August 25, 2000, auction of the trade fixtures and removable restaurant equipment, the status of the property remained unchanged as both parties waited for a resolution of the removal-of-the improvements issue. On October 24, 2000, Double James swore out a detainer warrant in Hamilton County, seeking possession of the premises. On November 2, 2000, Durnelco filed a motion to dismiss Double James' detainer warrant. In its motion, Durnelco stated the following:

> While [Durnelco] argues that [Double James] is not entitled to possession of the premises based upon the theories asserted by [Double James], [Durnelco] is amenable to surrendering possession of the premises to [Double James] as soon as an agreement between the parties is reached which allows [Durnelco] to remove all of its improvements from the premises according to the terms of the lease.

Double James' detainer warrant and Durnelco's response both suggest that as of November, 2000, both parties seemed to consider Durnelco to be in possession of the premises. There is no doubt that the trial court's award of $2,000 rent for July 2000 is proper. Considering all of the circumstances of the case, we find the award of rent in the amount of $5,000 for the period of August through mid-December to be reasonable and proper.

## VI.

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellant Durnelco. This case is remanded to the trial court for enforcement of the judgment and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE