**HEYER–JORDAN & ASSOCIATES, INC., Plaintiff–Appellee,**

v.

**Louis V. JORDAN and Calvin H. Brown, Jr., Defendants–Appellants.**

Court of Appeals of Tennessee, Western Section, at Jackson.

Sept. 12, 1990.

Application for Permission to Appeal Denied by Supreme Court Nov. 19, 1990.

John J. Heflin, III, James C. Branum, Jr., Memphis, for plaintiff-appellee.

John W. Chandler, Jr., Beth Weems Bradley, Memphis, for defendants-appellants.

## CRAWFORD, Judge.

This case involves the enforcement of a noncompetition clause in an employment contract.

Defendants, Lewis V. Jordan and Calvin H. Brown, Jr., appeal from the judgment of the chancellor awarding a money judgment to plaintiff, Heyer–Jordan & Associates, Inc., and granting injunctive relief.

In its complaint, Heyer–Jordan & Associates, Inc. avers that it is engaged in the business of acting as a manufacturer's sales representative. Plaintiff avers that the defendants Calvin Brown and Lewis Jordan, as employees of Heyer–Jordan, were each acting under a 1980 Sales Representative Agreement at the time just prior to their resignation. These agreements, which were identical, except for the sales territory and rate of commission, included the following provisions:

> For three (3) years following his termination ("Post–Termination Period") as a sales representative of Agent[1], Sub–Agent shall not undertake any employment or activity competitive with Agent's Business wherein the loyal and complete fulfillment of the duties of the competitive employment or activity would inherently call upon Sub–Agent to reveal, to base judgments upon or otherwise to use, any confidential business information of Agent's Business to which Sub–Agent had enjoyed access at Agent's Business.

> While acting as a sales representative of Agent, Sub–Agent shall not and agrees that he will not undertake planning for or organization of any business activity competitive with Agent's Business, or combine or conspire with other employees or sales representatives of Agent's Business for the purpose of organizing any such competitive business activity. (Emphasis supplied).

Plaintiff avers that, by letter dated March 15, 1989, Louis Jordan resigned from Heyer–Jordan and that by letter dated March 14, 1989, Calvin Brown resigned. Their resignations became effective April 15, 1989.

The complaint alleges that prior to their resignations, defendants engaged in activities in violation of their respective agreements. Plaintiff avers that defendants willfully conspired and planned to go into business together in competition with plaintiff and that they solicited the business of manufacturers which were represented by Heyer–Jordan. Plaintiff also alleges that defendants breached their duty of loyalty by contacting manufacturers represented by Heyer–Jordan while still contractually obligated to Heyer–Jordan.

Plaintiff alleges that subsequent to their resignations, defendants breached the terms of their agreements by soliciting the business of the manufacturers represented by Heyer–Jordan and that defendants have used confidential business information in violation of their agreements in setting up and conducting a competing business. Plaintiff alleges that this confidential business information consisted of customer lists, brochures, product information, administrative procedures of Heyer–Jordan as well as the long-standing personal relationships established through Heyer–Jordan.

Subsequently, plaintiff amended its complaint to allege that defendants unlawfully procured the breach of a contract, and alleged a cause of action for treble damages under the common law of T.C.A. § 47–50–109. Plaintiff alleges that by contacting manufacturers while still contractually obligated to Heyer–Jordan, defendants urged, induced and persuaded one or more of Heyer–Jordan's accounts to terminate their contract with Heyer–Jordan and enter into contracts with the new company established by the defendants.

In their answer, the defendants admit that they had acted under the Sales Representative's Agreement in question, but assert that they each signed their agreements

---

1. Heyer–Jordan is referred to as Agent and the defendants are referred to as Sub–Agent.

"under the duress of a threat of losing of his job." In any event, the defendants deny that they breached any provision of the agreement. They admit that, prior to their resignations, they contacted manufacturers represented by Heyer–Jordan for the purpose of formulating an offer to purchase the company which Lloyd Jordan, the sole shareholder in Heyer–Jordan had requested them to make. They assert that the plaintiff, Heyer–Jordan, waived its right to enforce the covenants in the sales representative's agreement when the sole shareholder in the company requested that they make this offer.

The defendants counterclaimed for the commissions which they allege they are due under their sales agreement for sales orders which they placed prior to April 15, 1989, the effective date of their resignation. In its answer to the counter-complaint, Plaintiff denied that it had agreed to pay commissions on all sales made by the defendants, but rather asserted that it had agreed to pay commission on all sales actually shipped prior to the effective date of the defendants' resignation.

The material facts are basically undisputed and the record consists of the various exhibits and the testimony of Lloyd Jordan, the sole stockholder and chief operating officer of plaintiff and the testimony of the defendants, Jordan and Brown. We will briefly review the testimony of these witnesses:

## LLOYD JORDAN

He is the sole shareholder and President of Heyer–Jordan & Associates, Inc., which is a manufacturer's sales representative company covering the states of Arkansas, Louisiana, Mississippi, Tennessee, Alabama, Kentucky and northwest Florida. Heyer–Jordan had contracts with various manufacturers to sell their products to retailers and these contracts are all subject to termination, by either party, on thirty days notice. The business started in 1950 and he took over the business in 1972.

In 1976, he hired his brother Louis Jordan as a sales person for the company. Prior to this, Louis Jordan had not had any experience as a manufacturer's representative and Lloyd taught him all the things he needed to know to succeed. He taught Louis about traveling, analysis of potential customers, and the various manufacturers as well as how to place orders. Louis was a salaried employee until 1978 when he went on a commission basis. Louis Jordan signed the 1980 agreement in question because the commission structure it contained was a better deal for him than the 1978 contract under which he was working.

Calvin Brown was hired in 1977 and he trained Calvin in much the same manner as he had trained Louis. Calvin Brown was also salaried until he went on commission under the 1980 agreement.

About February 8, 1989, Calvin Brown and Louis Jordan approached him and complained that they were unhappy with their commissions. He told them that if they wanted more money they should sell more. When they did not find that response satisfactory, he told them that they could make an offer to buy their territories from him. He did not authorize them to contact any manufacturers in the process of formulating such an offer. Upon cross examination, it was revealed that in his deposition, Lloyd Jordan testified that he requested them to "make me an offer," which could be interpreted to be an offer for the whole company. Calvin Brown and Louis Jordan made such an offer together for the purchase of Heyer–Jordan. He rejected their offer on its merits, but did not object to Brown and Jordan making a joint offer. Louis Jordan and Calvin Brown sent letters of resignation to Heyer–Jordan dated March 14th and March 15th with an effective date of resignation of April 15, 1989.

He testified several actions taken by defendants were in violation of the agreement and caused damages to Heyer–Jordan. He received notice of the defendants' resignation from Bob Cornetti of Norton Consumer Products, before receiving notice from the defendants. He felt it was harmful to Heyer–Jordan for the defendants to contact manufacturers about their resignation before he personally had the opportunity to assure the manufacturers of the

quality of continued representation that Heyer–Jordan could provide them. There was no reason why the defendants had to contact manufacturers before making their offer to him rather than making an offer contingent upon future acceptance by the manufacturers.

Lloyd Jordan also testified as to what is encompassed in the term "confidential business information" as used in the employment contracts, we quote from the record:

That I would think is probably one of the most important confidential things they have, to have them knowledgeable of all the principals at the various factories and how to work with them, the knowledge of where to take these particular products, to what specific accounts in the territory. It is not something that you can go out and just hire anybody off the street and have them know where to take the products and how to get along with the principals at the various factory levels.

\* \* \* \* \* \*

... That's everything from the president of the company to a vice-president, to a national sales manager, to a regional manager, any of the people involved with representing a manufacturer.

\* \* \* \* \* \*

Well, confidential information is the knowledge and the exposure that they get with the factories that we represent while they are representing Heyer–Jordan. That is confidential information its not something that you just come by over night.

\* \* \* \* \* \*

Well, how to make a sale, the people at the customer level, be it a distributor or a retail dealer. All these people that you come into contact with are very important, and if you don't have the knowledge of who they are, and who is the decision-maker at various companies, then you are at a tremendous disadvantage, and the only way you get that is through experience in the field which I had and taught to these gentlemen.

\* \* \* \* \* \*

I knew when I hired people that they would be making contacts and getting knowledge with the factories that Heyer–Jordan represented, and I considered this confidential, from a standpoint of competition. Also that's why I asked for three years after anybody left the company that they couldn't use this information.

Its gives Lewis and Calvin many, many advantages over anybody else in the industry who would go after Norton and International Steel Wool. And Norton International Steel Wool is what they've gone after. And the reason they've been able to be successful in getting Norton is because of contacts that they made while they were under my employment and working for my company, and they've used all of that. I consider that to be confidential information that anybody else that interviewed for that line would not have had, and it gave them a very distinct advantage.

I have no objection, whatsoever, of them using that information, going out and competing for Corona Brush and any other abrasive manufacturer. The only thing I want to protect is the company that Heyer–Jordan had in fold when they left, and that's where they are violating and causing harm to my company.

\* \* \* \* \* \*

Well, the fact that they know everything about the Norton line. A new rep would have to be taught and trained and it takes years as both of those gentlemen have stated earlier. This line is broad. It's very extensive. It takes a lot of knowledge to know how to sell it, and they acquired all this knowledge while they were working with Heyer–Jordan. If they didn't have that, and they approached Norton, or if they approached International Steel Wool, I think they get shot down in a minute. And that's the advantages that they have over anybody else that interviewed.

Subsequent to the resignation of the defendants, both Norton Consumer Products, and Norton Janitorial, terminated their con-

tracts with Heyer–Jordan. Lloyd Jordan testified that in 1987, these two manufacturers accounted for 49.4 percent of Heyer–Jordan business and 42.4 percent in 1988. Additionally, at the time of trial, International Steel Wool had indicated it might leave. International Steel Wool had accounted for 16 percent of Heyer–Jordan's business in 1987, and 21 percent in 1988.

With respect to the counter-claim made by the defendants, he testified about the industry custom for the payment of commissions. According to this testimony, it is customary in the manufacturer's representative business for a manufacturer to begin paying commissions to a new representative on shipments made immediately after the representative takes over a territory, regardless of whether that representative or the previous representative actually placed the order. Thus, a representative may make a commission on a sale he had no part in negotiating. The opposite side of the custom is that when a representative ceases to represent a manufacturer, they are paid commissions only on sales they made which were actually shipped before their effective date of termination. Lloyd Jordan gave examples of how Calvin Brown and Louis Jordan received the benefits of this custom when they took over their territories and explained that the defendants' new company, Jordan–Brown Marketing Group, Inc., is receiving commissions on orders that Lloyd Jordan placed before losing the Norton account, because the defendants' new company is the current representative for Norton.

## LOUIS JORDAN

Louis Jordan began working with Heyer–Jordan in July of 1976. Lloyd Jordan worked with him for no more than two weeks when he began and he was provided a list of housewares accounts on which to call. At the time that he began working with Heyer–Jordan, Heyer–Jordan did not represent any of the manufacturers which they represented at the time of his resignation. He was salaried until 1978 when he agreed to go on commission. In 1980, he signed the agreement at issue here which gave him a flat 70 percent commission.

Despite this agreement, there were times when he was paid a commission as high as 80 percent.

A dispute arose when Heyer–Jordan cut the rate of commission that Louis Jordan and Calvin Brown were being paid. At that time, the commission which Louis Jordan was being paid was reduced from 80 percent to 75 percent which he admits was still more than the rate provided for in his agreement.

During a meeting between Lloyd Jordan, Calvin Brown and himself, Lloyd Jordan asked them to make an offer to buy out the company. He admits that, without asking Lloyd Jordan's permission, he and Calvin Brown contacted Bob Cornetti at Norton Consumer Products Division and Neal Bonn at International Steel Wool during the process of formulating their offer to buy out Lloyd Jordan's interest in Heyer–Jordan. He thought he had the right to contact the company once the request for an offer was made. He felt that the request for an offer made the contract between him and Heyer–Jordan null and void.

He admits that, after their offer was rejected, he and Calvin Brown formed a company together to compete with Heyer–Jordan. He admits having letterhead prepared for the new company, Jordan–Brown Marketing Group, Inc., and sending a letter dated April 5, 1989, to Bob Cornetti. He did this at Cornetti's request for a detailed plan of action for representing the Norton Consumer Products Division. He also admits sending a similar plan of action upon the request of Neal Bonn to International Steel Wool before the effective date of their resignation. He admits that he deals with the same people at Norton that he met when he was with Heyer–Jordan.

He testified about his understanding of the phrase "confidential business information." It could not mean the experience in a business or the contacts made while working with a company. Information on a particular manufacturer's product and lists of the current buyers for that product are provided by the manufacturer. Similar lists of potential buyers for a product can

be obtained from "buyer's groups," to which businesses in a particular industry belong. Furthermore, information on manufacturers and buyers can be obtained through contacts at trade shows as well as information in trade magazines and even the yellow pages of the telephone book. He asserts that he is not using any confidential business information of Heyer–Jordan in his business now.

With respect to the defendant's counter-claim, he admits that the key to determining which manufacturer's representative is paid the commission on a sale is deciding who is the agent in control of the account in a territory when the goods are shipped into that territory. At the time of trial, he had not calculated what amount would be due him for sales orders he placed but which had not been shipped before he left Heyer–Jordan. He admitted that the industry custom, about which Lloyd Jordan testified, is being followed by Norton Janitorial Division and that Jordan–Brown Marketing Group, Inc., is receiving the benefit of the custom because they have been receiving commission payments from Norton for items actually shipped on or after the date that Jordan–Brown Marketing Group, Inc., became their sales representative, regardless of who placed the order.

The chancellor held that the defendants breached their duty of loyalty owed to the plaintiff, but that no damages were proved resulting from such breach. He also found that the defendants had breached the provisions of their employment contracts which provide that "[Jordan and Brown] shall not undertake any employment or activity competitive with [Heyer–Jordan's] business wherein the loyal and complete fulfillment of the duties of the competitive employment or activity would inherently call upon [Jordan and Brown] to reveal, to base judgment upon or otherwise to use, any confidential business information of [Heyer–Jordan's] business to which [Jordan and Brown] had enjoyed access at [Heyer–Jordan's] business."

The final judgment provides in part:

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the defendants, Louis V. Jordan and Calvin H. Brown, Jr., be and they are hereby enjoined for a period of three years, beginning April 15, 1989 and terminating April 14, 1992, from violating the restrictive covenants contained in their Sales Representative Agreements executed in early 1980 and that they be and are hereby specifically prohibited during the term of this injunction from representing any of the manufacturers' accounts which they represented while at any time associated with the plaintiff, and/or from using the customer contacts and other confidential business information, including their knowledge of the very nature and character of plaintiff's business, their knowledge regarding plaintiff's accounts, the size and monetary value of the plaintiff's accounts and the very existence and viability of the said accounts, in competition with the plaintiff.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the plaintiff, Heyer–Jordan & Associates, Inc. have and recover against the defendants, Louis V. Jordan and Calvin H. Brown, Jr., a judgment in the total amount of gross commissions which the said defendants and/or the company which they formed have received from the Norton and Norton Janitorial accounts since April 15, 1989. This issue is referred to the Chancery Clerk to act as Master in determining the amount of gross commissions received by the defendants since April 15, 1989 should there be a dispute as to that amount.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendants Louis V. Jordan and Calvin H. Brown, Jr. be and they are hereby adjudged to have violated their contractual and common law duties of loyalty to the plaintiff. However, no damages are assessed against the defendants by reason of their breach of their duties of loyalty.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the counter-claim of the defendants against the plaintiff be and it is hereby dismissed in its entirety.

■ Defendants' first issue presented for review as stated in their brief is:

1. Whether the trial court erred in holding that Louis V. Jordan and Calvin H. Brown, Jr. breached the restrictive covenants in their Sales Representative Agreements with Heyer–Jordan & Associates, Inc., by using "confidential business information" of Heyer–Jordan & Associates, Inc.

All the parties concede that the restrictive covenant in the case at bar is narrowly drawn. They disagree, however, on the interpretation of the covenant. Defendants assert that they are only prohibited by the covenant from competing with plaintiff under the circumstances where they use confidential business information acquired by them during their employment with the plaintiff. They argue that they had no confidential business information which they used in competing with the plaintiff; therefore, they did not violate the restrictive covenant and should not be enjoined from further competing with the plaintiff.

Plaintiff asserts, on the other hand, that defendants did use confidential business information in handling the accounts of Norton Consumer Products and Norton Janitorial. Plaintiff correctly states in its brief that, "The central issue in this litigation is whether those personal relationships with manufacturers and accounts at which their products are sold, knowledge of the manufacturers' products, sale programs, discounts, ordering and shipping methods developed by Jordan and Brown over more than ten years of acting as Heyer–Jordan's representatives, are 'confidential business information' within the meaning of the parties' 1980 Agreements."

■ Agreements in restraint of trade, such as covenants restricting competition, are not invalid per se. Although disfavored by law, such agreements are valid and will be enforced provided they are deemed reasonable under the particular circumstances. *Allright Auto Parts, Inc. v. Berry*, 219 Tenn. 280, 409 S.W.2d 361, 363 (1966).

The proof established that manufacturers routinely furnish a selling agent the information and/or training concerning their products. In the case at bar, it was developed that when Jordan and Brown were first hired by Heyer–Jordan they were furnished the information initially about purchasers of various manufacturers' products. However, this information has lost its importance because Heyer–Jordan does not represent the same manufacturers that it represented at the time Jordan and Brown were initially hired. The proof does not establish that there were any confidential customer lists furnished to Jordan and Brown and both Jordan and Brown testified that there are many sources available to determine the identity of potential purchasers of the manufacturer's products, including, but not limited to, telephone book yellow pages, trade magazines and registration lists of trade associations conventions. The proof also establishes that it is standard practice for a manufacturer to furnish customer lists to new representatives that take over the account. Jordan and Brown argue that there is absolutely no proof in the record of any "confidential business information" which they acquired and which they used in engaging in a competitive business with Heyer–Jordan. Lloyd Jordan, the sole stockholder and President of Heyer–Jordan, testified that his interpretation of the contract was that confidential business information used by Jordan and Brown was the knowledge and training they received in dealing with the various manufacturers. He testified:

Well, the fact that they know everything about the Norton line. A new rep would have to be taught and trained, and it takes years, as both of those gentlemen have stated earlier. This line is broad. It's very extensive. It takes a lot of knowledge to know how to sell it, and they acquired all this knowledge while they were working with Heyer–Jordan. If they didn't have that, and they approached Norton, or if they approached International Steel Wool, I think they'd get shot down in a minute. And that's

the advantages that they have over anybody else that interviewed.

We have not been furnished, nor has our research developed any case dealing with the precise question presented here. The contract, which was prepared on behalf of Heyer–Jordan, does not define the term "confidential business information."

■ In construing contracts, the words expressing the parties' intentions should be given the usual, natural and ordinary meaning and in the absence of fraud or mistake, a contract must be interpreted and enforced as written, even though it contains terms which may be thought harsh and unjust. *Ballard v. North American Life & Casualty Co.*, 667 S.W.2d 79 (Tenn. App.1983).

■ Where there is no ambiguity, it is the duty of the court to apply to the words used their ordinary meaning and neither party is to be favored in their construction. *Brown v. Tennessee Auto. Ins. Co.*, 192 Tenn. 60, 237 S.W.2d 553 (1951).

Heyer–Jordan readily concedes that there is nothing in the contract to prohibit Jordan and Brown from competing with Heyer–Jordan in the same line of work and the same territory and at the same time, but asserts that if they did compete, "they could not use any confidential business information acquired while working at Heyer–Jordan."

*Webster's New Collegiate Dictionary* (1981) defines the adjective "confidential" as private, secret. Giving the phrase confidential business information its usual and ordinary meaning it could be said that it is private or secret information pertaining the business. It would appear that confidential business information is akin to trade secrets. In *Hickory Specialties v. B & L Laboratories*, 592 S.W.2d 583 (Tenn.App. 1979), the Court said:

> Trade secrets are defined in *Allis–Chalmers Mfg. Co. v. Continental Aviation & Eng. Corp.*, 255 F.Supp. 645 (E.D. Mich.1966):
>
> > [T]he weight of modern authority .. holds that a trade secret may consist of any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it. [Citations omitted.] P. 653.

On the issue of secrecy, the Court continued:

> The subject matter of a trade secret must be secret. Matters of public knowledge or general knowledge in the industry or ideas which are well known or easily ascertainable, cannot be trade secrets. Similarly, matters disclosed by a marketed product cannot be secret. However, the proprietor of the business may communicate the secret to employees involved in its use, or to others pledged to secrecy. *Ibid.* (Emphasis added).

592 S.W.2d at 586–87.

■ Lloyd Jordan testified on behalf of the plaintiff that defendants were successful in obtaining the Norton account because of the contacts that they had made while they were in the employ of Heyer–Jordan and that he considered this to be confidential information. Plaintiff argues that the personal relationship established between the employee and the manufacturer is confidential business information. Certainly, restrictive covenants protecting an employer have been held reasonable where the employee "closely associates or has repeated contact with the employer's customers so that the customer tends to associate the employer's business with the employee." *Hasty v. Rent–A–Driver, Inc.*, 671 S.W.2d 471, 473 (Tenn.1984). Plaintiff, by appropriate language, could have reasonably restricted competition by defendant with plaintiff's former customers, but plaintiff chose not to do so. We do not feel that the customer's association of the employer's business with the individual employee is "confidential business information" in the context of the usual and ordinary meaning of such words. The Court must construe the contract as written and cannot create a new contract for the parties. *St. Paul Surplus Lines v. Bishops Gate Insurance*, 725 S.W.2d 948 (Tenn. App.1986).

In the case at bar, it appears that all of the information acquired by Jordan and Brown and used by them in their competitive effort was general information available in the trade and business involvement, and that they were not privy to any confidential business information which they used in violation of the contract. In *Selox, Inc. v. Ford,* 675 S.W.2d 474 (Tenn.1984) our Supreme Court quoted with approval comment "g" to § 188 of the Restatement of Contracts. The last sentence of the quotation approved by the court states: "A line must be drawn between the general skills and knowledge of the trade and information that is peculiar to the employer's business." 675 S.W.2d at 476.

From our review of the record, we conclude that the defendants, Jordan and Brown, did not reveal, base judgments upon or otherwise use confidential business information of Heyer–Jordan's business in their competition with Heyer–Jordan, but initially relied upon their "general skills and knowledge of the trade.". Therefore, we hold that the chancellor erred in enjoining the defendants as set out in the final decree and erred in awarding damages to Heyer–Jordan in the amount of the gross commissions earned by Jordan and Brown from the accounts formerly owned by Heyer–Jordan.

The next issue presented for review as stated in defendants' brief is:

4. Whether the trial court erred in failing to award a judgment in favor of Louis V. Jordan and Calvin H. Brown, Jr. against Heyer–Jordan and Associates, Inc., on their counterclaims for commissions they earned prior to the effective date of their resignations.

Jordan and Brown resigned effective April 15, 1989. Prior to April 15, 1989, they placed orders on behalf of Heyer–Jordan, but some of the products were not shipped from the manufacturers to the customers until after April 15, 1989. Jordan testified that he was owed commissions from sales he made prior to April 15, 1989, and shipped subsequent to April 15, 1989, in the amount of $2,192.88. Brown testified that he was due commissions under the same circumstances in the amount of $753.30.

Heyer–Jordan contends that commissions on sales are only due after they are shipped by the manufacturer. Lloyd Jordan testified that this is the usual custom and practice in the trade. The proof also established that Jordan and Brown acquiesced in the so-called custom while they were employed with Heyer–Jordan and received the benefit of the custom when they took over the Norton accounts in May of 1989. The evidence does not preponderate against the chancellor's finding that defendants did not meet their burden of proof on the counterclaim.

Accordingly, the judgment of the trial court awarding damages to plaintiff and enjoining defendants from further competition is vacated, and the judgment is in all other respects affirmed.

Costs of appeal are assessed equally against the parties.

TOMLIN, P.J., W.S., and HIGHERS, J., concur.