# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 11, 2007 Session

## M. R. STOKES COMPANY, INC. v. MICHAEL L. SHULAR, ET AL.

**A Direct Appeal from the Circuit Court for Sumner County**
**No. 27058     The Honorable C. L. Rogers, Judge**

---

**No. M2006-02659-COA-R3-CV - Filed February 26, 2008**

---

This is a construction case. In a contract prepared by the plaintiff, contractor agreed to install sewer lines, water lines, roads and to perform certain site preparation work for a section of a subdivision development owned by the defendant-owner. The total contract price is $925,000, which includes the material and labor to complete the project. The trial court entered judgment for contractor. Owner appeals and contractor cross-appeals. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part and Remanded**

W. FRANK CRAWFORD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S. and JEFFREY F. STEWART, SP.J., joined.

Cecil D. Meek, Jr., and Edward L. Summers of Knoxville, Tennessee for Appellants, Michael L. Shular, Trustee and Ohio Casualty Insurance Company

Mary Beth Hagan and Gareth S. Aden of Nashville, Tennessee for appellee and Cross-Appellant, M. R. Stokes Company, Inc.

## OPINION

### Facts and Procedural History

In 2003, Defendants, Michael L. Shular, Trustee, Shular Contracting, and Ohio Casualty Insurance Company[1] (hereinafter collectively, "Owner") planned the development of Somerset Downs (hereinafter, "the Project"), a residential subdivision in Sumner County, Tennessee. Owner, by and through Shular Contracting, Inc., submitted a letter of intent to enter into a contract with

---

[1]Ohio Casualty Insurance Company is the surety on a bond, which was executed to "bond off" a mechanics and materialman's lien filed by the Contractor. Its interest is identical to that of Michael L. Shular, Trustee.

Plaintiff, M. R. Stokes Company, Inc. (hereinafter, "Contractor") for Contractor to perform all work under the plans and specifications, including the installation of sewer lines, water lines, roads, and certain site preparation work for the total sum of $925,000.00. In determining its bid, Contractor reviewed the construction plans given to him by Owner. Contractor then submitted a written, one-page "Proposal" (hereinafter, "Contract") to Owner. Both parties signed the Contract, together with an attached Addendum, on August 6, 2003. In the Contract, Contractor agreed to furnish material and labor to complete the Project, in accordance with the specifications listed on the Contract for $925,000.00. The Contract incorporated certain pages of the development plans and stated that Contractor would perform the following work:

1.  Install roads and widening of Long Hollow Pike per plans.

2.  Road drainage with structures, drain lines and outlet headwalls.

3.  Sewer line connected to manhole M21 (but not including manhole).

4.  Detention pond #3 and site drainage areas.

5.  Water lines and tap assemblies.

6.  600 feet of ductile sewer line is included, if required.

7.  All labor, materials, (as noted) and required equipment to do the work as shown on contract drawings C1.00 to C1.04, C2.01 to C2.10, and C3.01, C4.01 and C4.02.

8.  All work shall meet all Sumner County and White House Utility specifications.

The Contract further stipulated that "[a]ny alteration or deviation from above specifications involving extra costs will be executed only upon written orders, and will become an extra charge over and above the estimate." Additionally, the Addendum, which is signed by both parties, specifies in part that a "5% [r]etainage [is] to be withheld from each Progress Payment" and that "[r]etainage [is] to be paid within 30 days of completion . . . ."

Contractor commenced working on the Project, including installing the gravity sewer lines in Phase 1 of the Project. When an inspector from White House Utility District (hereinafter, "WHUD") examined the gravity sewer lines, he found that 5% of the sewer lines did not conform to WHUD's written specification that the sewer pipe "shall be straight and show a uniform grade between manholes." Contractor did not attempt to fix the problems, and ceased working on the Project in December of 2004. On January 10, 2005, the Contractor submitted its last "pay application" to Owner. This pay application requested payment of the remaining 5% "retainage"

amount, a total of $43,676.25, that had been set aside during the course of the Project. Owner refused to pay Contractor.

On June 17, 2005, Contractor filed suit claiming that Contractor had completed the work under the Contract, had performed additional work outside the Contract, and was due $97,646.61. Contractor also alleged that it was due the fair market value for topsoil, which Contractor allegedly had been promised, and which had been distributed to a third party by Owner. On August 24, 2005, Contractor amended its Complaint to allege that an additional $11,871.72 was due under the Contract. Owner answered and argued that there was not an agreement for any changes to be paid at the end of the Project unless those changes were evidenced by a written change order. The Contractor submitted eleven "pay applications" over the period of 15 months, none containing any "changes." Owner also alleged that Contractor had not properly completed the Contract. Furthermore, Owner sought set-offs and/or recoupment for work performed by a third party at Owner's expense after Contractor allegedly walked off the Project.

The matter was heard before the Circuit Court of Sumner County, Tennessee. After a three-day bench trial, the trial court rendered a judgment in favor of the Contractor against the Owner in the amount of $69,927.18 ($43,678,00 for the unpaid retainage and $26,249.18 for extra costs from alterations or deviations from the Contract specifications), plus 8% pre-judgment interest from January 1, 2005. The trial court found that Owner had breached its Contract with Contractor, denied Owner's claim for credit, offset, and/or breach of contract by Contractor, and denied Contractor's claim for the fair market value of the topsoil.

Contractor filed a motion to alter or amend and a motion for discretionary costs. On January 8, 2007, the trial court entered an Order striking any judgment against Michael Shular and Teddy Adams, in their individual capacities, and amended the parties against whom the judgment should apply to Defendant Michael Shular, Trustee, and Defendant Ohio Casualty. Furthermore, the Order granted Contractor's discretionary costs in the amount of $3,519.03 for a total Judgment of $73,446.21, plus 8% pre-judgment interest per annum from January 5, 2005. The trial court also granted Owner's Motion to Stay pending appeal. Owner appeals.

**Issues on Appeal**

On appeal, Owner's issues are as follows:

1.    Whether the trial court erred in concluding that the contractual provision requiring written change orders for any alteration or deviation from specifications involving extra costs was waived, and/or in concluding that any oral agreements had been reached involving such extra costs.

2.    Whether the trial court erred in not enforcing the terms of the written contract between the parties, including, the contractual

-3-

obligation of contractor that "all work shall meet all Sumner County and White House Utility specifications."

3.  Whether the trial court erred in finding that a so-called discretionary standard of White House Utility District in determining the suitability of the uniform grade of sewer lines was not contained in Contractor's contract with the owner.

4.  Whether the trial court erred in concluding in its Oder of November 16, 2006, that the Owner breached his contract with the Contractor.

5.  Whether the trial court erred in granting judgment against owner in the amount of $73,446.21, consisting of $43,678.00 retainage, $26,249.18 extra costs from alterations or deviations from the contract specifications, and $3,519.03 in discretionary costs, plus 8% prejudgment interest from January 1, 2005.

6.  Whether the trial court erred in denying the owner various credits, offsets and recoupment for non-performed and/or improperly performed construction work by contractor.

7.  Whether the trial court erred in finding that the contract does not require the Contractor to issue credit to the Owner for incurring less costs due to failure to perform the work according to the plans and specifications.

The Appellee/Cross-Appellant's issue is as follows:

1.  Whether the trial court erred in refusing to enforce the contract between the parties to give the contractor the surplus topsoil on the project.

**Standard of Review**

In a non-jury case, we evaluate the trial court's findings of fact *de novo* and afford those findings a presumption of correctness unless the preponderance of the evidence is otherwise. *See, Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997) (citing **Tenn. R. App. P. 13 (d)**). In evaluating the trial court's findings of fact in this case, we are mindful of the following:

Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See, State v. Pruett*,

788 S.W.2d 559, 561 (Tenn. 1990); **Bowman v. Bowman**, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See,* **Tenn-Tex Properties v. Brownell-Electro, Inc.**, 778 S.W.2d 423, 425-26 (Tenn. 1989); **Mitchell v. Archibald** , 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See,* **Humphrey v. David Witherspoon, Inc.**, 734 S.W.2d 315, 316 (Tenn. 1987); **Bingham v. Dyersburg Fabrics Co., Inc.** , 567 S.W.2d 169, 170 (Tenn. 1978).

We review a trial court's conclusions of law under a purely *de novo* standard of review affording no presumption of correctness to those findings. *See,* **Union Carbide Corp. v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993); **Adams v. Dean Roofing Co. Inc.**, 715 S.W.2d 841, 848 (Tenn. Ct. App. 1986).

**Discussion**

*Deviations from the Contract*

Owner first raises the issue of whether the trial court erred in concluding that the contractual provision requiring written change orders had been waived, and/or in concluding that any oral agreements had been reached involving such extra costs.

It is well-settled in Tennessee that contract provisions can be waived, especially in construction projects because of the nature of construction which often require decisions to be made quickly to keep the project progressing. **Moore Constr. Co. v. Clarksville Dep't of Elect.**, 707 S.W.2d 1, 13 (Tenn. Ct. App. 1985). It is common for courts to find that "an owner has waived a written notice requirement in cases where extra work has been ordered verbally by the owner or the extra work has been performed with the owner's knowledge and without its objection." **Id.** (citations omitted). The course of dealing between the parties can also amount to a waiver where the conduct of the parties makes it clear that they did not intend to rely strictly upon a contract's written notice requirement. **Realty Shop, Inc. v. RR Westminster Holding, Inc.**, 7 S.W.3d 581, 601 (Tenn. Ct. App. 1999).

In **Jane Doe, et al. v. HCA Health Services of Tennessee, Inc., d/b/a HCA Donelson Hospital**, 46 S.W.3d 191, 196 (Tenn. 2001), the Tennessee Supreme Court discussed elements essential to the formation of an enforceable contract as follows:

> A contract " 'must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced.' " **Higgins v. Oil,**

***Chem., and Atomic Workers Int'l Union, Local # 3-677***, 811 S.W.2d 875, 879 (Tenn. 1991) (quoting ***Johnson v. Central Nat'l Ins. Co. of Omaha***, 210 Tenn. 24, 34-35, 356 S.W.2d 277, 281 (Tenn. 1962) (citations omitted)). Indefiniteness regarding an essential element of a contract "may prevent the creation of an enforceable contract." ***Jamestowne On Signal, Inc. v. First Fed. Sav. & Loan Ass'n***, 807 S.W.2d 559, 565 (Tenn. Ct. App. 1990) (citing ***Hansen v. Snell***, 11 Utah 2d 64, 354 P.2d 1070 (1960)). A contract " 'must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties.' " ***Higgins***, 811 S.W.2d at 880 (quoting ***Soar v. National Football League Players' Ass'n***, 550 F.2d 1287, 1290 (1st Cir. 1977); *see also* ***Restatement (Second) of Contracts*** **§ 33(2)** (1981) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.")

Two of the leading treatises on contract law provide additional authority concerning the requirement of definite contractual terms. "Certainty with respect to promises does not have to be apparent from the promise itself, so long as the promise contains a reference to some document, transaction or other extrinsic facts from which its meaning may be made clear." 1 Richard A. Lord, ***Williston on Contracts***, § 4:27, at 593 (4th ed. 1990). In addition, as stated in 1 Joseph M. Perillo, ***Corbin on Contracts***, § 4.3, at 567-68 (Rev. ed. 1993).

> If the parties provide a practicable method for determining [the] price or compensation there is no such indefiniteness or uncertainty as will prevent the agreement from being an enforceable contract. The same is true if they agree upon payment of a "reasonable" price or compensation. There are cases, however, in which it is clear that the parties have not expressly or implicitly agreed upon a "reasonable price," and also have not prescribed a practicable method of determination. Where this is true, the agreement is too indefinite and uncertain for enforcement.

Contractor drafted the Contract, which contained the provision requiring "[a]ny alteration or deviation from above specifications involving extra costs will be executed only upon written orders, and will become an extra charge over and above the estimate." Contractor claims that it is due extra money for four (4) deviations from the Contract. Contractor maintains that it used the

detailed plans provided by the Owner when making its bid, and that these four changes were either changes made because the plans were wrong or because the plans changed after Contractor made its bid. The extra costs were not contemplated by Contractor when making its bid. Contractor neither billed for these changes nor issued a written change order for these deviations from the Contract. The changes and costs are as follows:

> 1. Cost to tie-in water line at Long Hollow Road - $3,600.00 plus 10% profit and 12% overhead.

> 2. Cost to move fire hydrant and add dead-end assembly - $3,200.00 plus 10% profit and 12% overhead.

> 3. Cost to install water valves - $6,200.00 plus 10% profit and 12% overhead.\

> 4. Cost to install 3 dead-end assemblies - $9,009.00 plus 10% profit and 12% overhead.

Whether these changes were the result of Contractor's errors or Owner's errors is disputed in the record. Further, Contractor alleges that it and Owner agreed to "settle any changes at the end of the contract" on a "time and materials" basis. Essentially, Contractor argues that it and Owner, by their actions, agreed to waive the written change order provision of the Contract, and instead created a new verbal contract regarding how it would be paid for extra work outside the Contract. Owner counters that there was no such agreement, and that it cannot speculate as to what the price for Contractor's "time" is because, at no time, did Contractor specify what its time was worth. Contractor contends that Owner had notice of what its "time" was worth when it presented Owner with a credit memo regarding a change in the sewer line. In that memo, the labor accrues at $150.00 per hour. Owner alleges that this memo was not presented to it until January 10, 2005, along with the final pay application.

The trial court noted that the Contract requirement for written change ordered "received scant focus at trial," but found that Contractor and Owner waived the requirement of a written change order and "operated through out the contract in total disregard for written orders." The trial court noted that the "ordered alterations or plan deviations were made and neither [Contractor] [n]or [Owner] insisted upon ...or requested such written orders, each content with the course of performance." The trial court awarded Contractor $26,249.18 for extra costs from alteration or deviations from the Contract specifications.

To the extent that the parties' testimony is contradictory, we must assume that the trial court implicitly credited Contractor's testimony. The trial court's assessment of the credibility of the witnesses is, of course, accorded great deference on appeal. *Retail Builders, Inc. v. Latham*, No. M2004-00771-COA-R3-CV, 2005 WL 3508013 at *10 (Tenn. Ct. App. Dec. 22, 2005) (citing *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998)). With appropriate deference to the trial court's implicit determinations of credibility, we must conclude that the evidence does not preponderate against the trial court's finding that Contractor made the extra changes at Owner's or its agents' request. Also, noting the same deferential standard, we must conclude that the parties, by their actions, waived the written change order provision.

Still, the issue of whether the parties had a "meeting of the mind in mutual assent" regarding the price Contractor would be paid for the deviations from the Contract remains. Based upon our careful analysis of the record, with respect to each of the matters for which Contractor seeks additional payment, we are compelled to the conclusion that there was not a meeting of the minds of the parties in mutual assent to the terms at issue. We find that the parties "have not expressly or implicitly agreed upon a reasonable price nor have they agreed upon a practicable method of determination of price." Accordingly, we hold that any agreement to "settle up" based upon "time and materials" at the end of the Project is unenforceable.

Although we find that no enforceable contract exists, it would be inequitable for Owner to receive a windfall for the improvements Contractor made on Owner's behalf. For that, we turn to equitable remedies. It is well settled that the theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same. *Paschall's, Inc. v. Dozier,* 407 S.W.2d 150, 154 (Tenn. 1966). Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist. *Whitehaven Community Baptist Church v. Holloway,* 973 S.W.2d 592, 596 (Tenn. 1998) (citing *Paschall's,* 407 S.W.2d at 154-55). Such contracts are not based upon the intention of the parties but are obligations created by law and are "founded on the principle that a party receiving a benefit desired by him, under the circumstances rendering it inequitable to retain it without making compensation, must do so." *Paschall's,* 407 S.W.2d at 154. A contractual obligation under an unjust enrichment theory will be imposed when: (1) no contract exists between the parties or, if one exist, it has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation. *Holloway,* 973 S.W.2d at 596. In *Paschall's, supra,* the Court stated:

> Each case must be decided according to the essential elements of quasi contract, to-wit: A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.

In this case, we have already held that Contractor and Owner waived the provision requiring written change orders but that they did not create another contract regarding deviations from the

Contract. Thus, no contract existed regarding written change orders. Contractor claimed that its work on the deviations from the Contract totaled $26,249.18. The record reflects that Owner and/or its agents requested the changes, that the changes were not part of the original Contract, that Owner did not object to Contractor's performing the work, and the work benefitted Owner. Owner did not present any rebuttal evidence that Contractor's amounts were unreasonable. Therefore, the equities fall with the Contractor regarding the reasonable value of its work. Hence, we affirm the trial court's award to Contractor in the amount of $26,249.18 plus 8% prejudgment interest, albeit under a different legal theory.

*Compliance with the Contract*

Next, Owner raises the issue of whether the trial court erred when it found that Contractor complied with the White House Utility District specifications and its Contract. Specifically, Owner argues that the trial court failed to enforce the terms of the Contract between the parties, including the provision that states "[a]ll work shall meet all Sumner County and White House Utility specifications." The Contract incorporated certain sections of the "Final Master Development Plan for Somerset Downs," including drawings sheet C4.02. On sheet C4.02, the following notes are included:

> All water and sewer construction shall be in accordance with specifications and standard details of the White House Utility District.
>
> A pre-construction conference shall be held with representatives of the Contractor, the White House Utility District and the Engineer. All water line construction shall be coordinated with the White House Utility District, meet the District's standard water line specifications, and be in full compliance with the District's standards and procedures.
>
> Final location of water meters and service lines shall be field located and approved by White House Utility District. As a general guideline locate meters for adjoining lots at common lot lines.

Resolution of this issue is solely dependent upon the construction of the Contract and we will first review the case on that premise. The interpretation of a written agreement is a matter of law and not of fact; therefore, our review is *de novo* upon the record with no presumption of correctness of the trial court's conclusions of law. ***NSA DBA Benefit Plan v. Connecticut Gen. Life Ins. Co.,*** 968 S.W.2d 791, 795 (Tenn. Ct. App.1997). In ***Gray v. Estate of Charles Henry Gray,*** 993 S.W.2d 59, 64 (Tenn. Ct. App.1998), this Court said:

-9-

> The cardinal rule for interpretation of contracts is to ascertain the intention of the parties from the contract as a whole and to give effect to that intention consistent with legal principles. *Winfree v. Educators Credit Union,* 900 S.W.2d 285, 289 (Tenn. App. 1995); *Rainey v. Stansell,* 836 S.W.2d 117, 118 (Tenn. App.1992). In construing contracts, the words expressing the parties' intentions should be given their usual, natural, and ordinary meaning. *Taylor v. White Stores, Inc.,* 707 S.W.2d 514, 516 (Tenn. App.1985). In the absence of fraud or mistake, a contract must be interpreted and enforced as written, even though it contains terms which may seem harsh or unjust. *Heyer-Jordan & Assocs. v. Jordan,* 801 S.W.2d 814, 821 (Tenn. App.1990).

Contractor installed the gravity sewer lines in Phase 1 of the Somerset Downs development. When the inspector from WHUD examined the gravity sewer lines, he found that 5% of the sewer lines did not conform to WHUD's written specification that the sewer pipe "shall be straight and show a uniform grade between manholes." The record reflects that Contractor did not attempt to fix the problems, but rather walked off the job. At this point, the Contractor submitted its last "pay application" to Owner, which application requested the remaining 5% "retainage" amount that had been set aside during the course of the Project. Owner refused to pay Contractor. Contractor filed suit for breach of contract.

The trial court held that Contractor did meet the specifications of WHUD because the sewer lines passed the objective tests described in WHUD's manual, Standards and Specifications for Wastewater Construction (hereinafter, "Standards and Specifications"), even though 5% of the sewer lines did not pass the more subjective video test.[2]

Owner argues that the trial court failed to enforce the terms of the Contract between the parties, including the provision that states "[a]ll work shall meet all Sumner County and White House Utility specifications." Owner argues that the Contractor obligated itself to perform according to the specifications and details of WHUD. By agreeing to meet all WHUD specifications, Contractor had an affirmative duty to comply with *all* specifications of WHUD, not just certain tests listed in the Standards and Specifications. Contractor counters that, because

---

[2] General descriptions of the tests are as follows:

The first test is a "deflection test," which is administered by pulling a mandrel by a string through the pipe. This test determines if the pipe is of uniform roundness, but allows for a tolerance of 5%.

The second test is the "vacuum test," which is administered by "pull[ing] negative pressure inside the pipe with one of the pipe and it checks for air tightness." No leakage is permitted.

Another test is the "manhole vacuum test," which tests the air tightness of a manhole in a similar way to the vacuum test.

The video inspection test requires the sewer lines to be videotaped by the approved videographer and submitted to WHUD. A licenced inspector employed by WHUD inspects the video to make sure the pipes are "set straight and show a uniform grade between manholes."

the Standards and Specifications manual is silent as to what "WHUD is looking for in this video, what happens if WHUD finds that mysterious item, and what the contractor will have to do," the video inspection is not a "specification" under the Contract. Further, Contractor argues that WHUD's letter to Owner, failing a portion of the sewer pipe, cites the Development Agreement between Owner and WHUD as its authority to fail the sewer lines. The Development Agreement states:

> The District shall provide onsite construction inspection as the District deems necessary to insure that all work is performed and completed in accordance with the plans and the District's specifications...In the event of a disagreement as to compliance with interpretation of the plans and the District's specifications, the decision of the District shall be final and binding on the developer.

Contractor formed its Contract with Owner before this agreement was signed and, therefore, Contractor is not bound to this agreement. Our review of WHUD's letter reveals that WHUD states that the pipe does not meet their specifications and cites to section 3.08 of the Standards and Specifications, which requires that "[]p]ipe lines shall be straight and show a uniform grade between manholes."

The Contract does not say "Contractor agrees to comply with the Standards and Specifications manual" or "agrees to pass all WHUD objective tests," but rather that Contractor agrees to meet all White House Utility specifications. Absent ambiguities, which we do not have in this case, we must interpret contracts according to their plain language. A plain language reading of the Contract indicates that Contractor agrees to comply with what White House Utility District specifies, whether written or not, subjective or objective. The term "specifications" is, by its nature, a broad term. Had Contractor intended to be bound to a more narrow definition, it should have drafted the Contract language accordingly. Contractor had worked with WHUD before and was aware of WHUD's strict guidelines when drafting the Contract. The purpose of the Contract between Contractor and Owner was for Contractor, in part, to install the sewer lines for Owner so that Owner could develop an operating subdivision with plumbing that is acceptable to WHUD. Contractor did not fulfill its obligations under the Contract, and we reverse the trial court's decision holding that Contractor did not breach its Contract with Owner.

*Owner's Breach of Contract*

Owner's next issue is whether the trial court erred in finding that Owner breached its Contract with Contractor. In its Order of November 16, 2006, the trial court concluded that the Owner was "found to have breached its contract with Plaintiff (Contractor)." No findings of fact are cited in support of this conclusion. Owner refused to pay the Contractor its final pay application, which was the retainage amount of $43,678.00.

The Contract's Addendum provides that: "[r]etainage to be paid within 30 days of completion ([p]avement topping will not hold up retainage)." Our review of the record reveals that when the final pay application was submitted, Contractor had not completed its obligations under the Contract. The sewer lines had not been accepted by WHUD and a portion of the lines needed repairs. The retainage was not due until 30 days after completion. Having found that Contractor breached its Contract with Owner and did not complete its obligations under the Contract, we find that the retainage is not due to Contractor. Consequently, we reverse the trial court's holding on this issue and vacate the trial court's judgment in the amount of $43,678.00.

*Credits, Offsets, and Recoupment*

Finally, Owner argues that the trial court erred in denying Owner various credits, offsets, and recoupment for non-performed and/or improperly performed construction work and for finding that the Contract does not require Contractor to issue credits to the Owner for incurring less costs due to failure to perform the work according to the plans and specifications.

Owner contends that it spent substantial sums of money to hire another sewer contractor to perform the punch list in order to satisfy the requirements of WHUD. Further, Owner contends that there were deficiencies relating to work other than the sewer and water items. Owner states that it hired Johnny Rector to correct the deficiencies and paid him $48,000.00 toward the correction of the items specified by WHUD. Owner also paid Johnny Rector an additional $23,722.80 to perform other work not associated with the sewer. Those items are as follows:

> 1. Raise manhole and road grade where Phase I and Phase II meet - $2,613.50
>
> 2. Change road grade on Somerset Downs - $1,239.75
>
> 3. Raise storm structures - $1,469.55
>
> 4. Perform grade work behind Lots 2-5 (including hauling in fill dirt) - $14,950.00
>
> 5. Rework detention pond #3 - $3,450.00

Further, Owner alleges that it should be credited $31,280.00 because a portion of the sewer system was changed, which change resulted in the deletion of constructing six (6) manholes, as required by the Contract and $29,742.11 for the reduction in the size of a box culvert that Contractor constructed. Contractor argues that it gave Owner credit for the materials that were saved by not constructing the manholes, but that the labor costs were the same and that Contractor incurred extra costs for the change because additional pipe was needed.

On this issue, the trial court held the following:

> (7) As to credits and off-sets, the Court finds the contract between these parties is a fixed price contract, not a cost plus contract. The contract does not require Plaintiff to issue credit for Plaintiff's incurring of less costs due to alterations or changes in the project by the Defendants or the private utility. Plaintiff receives no extra for under calculations and Defendants receive no credits for over calculations.

> (a) The Defendants claim for credit regarding the road way bridge and wing walls is denied. The Defendants incurred no damages as a result of this portion of the project. The road way bridge and wing walls as built by the Plaintiff have been fully accepted by the County as public roadway.

> (b) The Court finds the Plaintiff's contract obligation does not include grading of lots for building houses as Defendants claimed.

> (c) The road grade costs the Defendant seeks regarding the connection of Section 1 and Section 2 of Defendant's subdivision are found to be not caused by any acts or omissions of the Plaintiff under his contract. The Plaintiff is found to have installed the road work in accordance with the Defendant's Surveyors/Engineers elevation specifications.

> (d) As to the detention pond, the Court finds the Plaintiff constructed the detention pond in accordance with the contract plans. Defendant is found to have made, allowed or directed subsequent changes. . . .

Whether these extra charges were the fault of Contractor is a question of fact. Accordingly, they are entitled to great weight on appeal and will not be overturned unless not supported by a preponderance of the evidence. *Mays v. Brighton Bank*, 832 S .W.2d 347, 352 (Tenn. Ct. App. 1992). Appellate courts will re-evaluate a trial judge's credibility determination only when clear and convincing evidence to the contrary exists. *Id.* Our review of the record indicates that the evidence does not preponderate against the trial court's decision with regard to Owner's extra costs which are not related to the sewer system. On that issue, we affirm.

We do, however, find that Contractor breached the Contract when it ceased working on the sewer system before it met WHUD specifications. Here, Contractor was contractually obligated to build the sewer system in compliance with WHUD specifications. Having found above that Contractor did not comply with these specifications, Owner is entitled to recoup monies expended to bring the sewer system into compliance with WHUD specifications.

The problem in this case is that, at the time of appeal, the sewer still has not been accepted by WHUD despite having two subsequent subcontractors work on the system. The primary purpose of assessing damages in breach of contract cases is to put the non-breaching party in the same position the party would have been in had the contract been performed. *See Lamons v. Chamberlain,* 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993); *Hennessee v. Wood Group Enters., Inc.,* 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991). While we favor the conservation of the judicial resources, we do not have sufficient evidence to calculate Owner's damages. Consequently, we vacate the damage award and remand the case to the trial court for the calculation of the damages Owner incurred as a result of Contractor's breach of the Contract.

*Topsoil Contract*

Contractor raises one issue as cross-appellant. Contractor argues that the trial court erred by refusing to enforce the oral contract between the parties to give Contractor the surplus topsoil from the Project. The Contract obligated Contractor to remove topsoil from the Project site and incorporated, by reference, several pages of the subdivision plans, including sheet C4.02. Under the General Notes on sheet C4.02, the following is noted:

> 5. Surplus material not required for site construction shall be disposed of by the contractor at the contractor's expense after the owner's approval.

> 6. Fill material required, if any, shall be borrowed at the Contractor's expense.

As part of the Contract, Contractor agreed to grade portions of the land to remove topsoil. Contractor alleges that, when preparing its bid for Owner, it contemplated that the soil depth would be approximately six (6) inches deep (which is a common top-soil depth in the area). However, when Contractor began grading the land, it discovered the soil depth to be four (4) or five (5) feet deep in some places. Nothing in the plans, specifications, or Contract represented the depth of the topsoil, nor was there a provision in the Contract discussing what would happen if the topsoil was deeper than originally contemplated. Contractor testified that it did not measure the topsoil before preparing its bid.

Contractor argues that it and Phil Loeffler, an authorized agent of the Owner, agreed that Contractor could have the surplus topsoil. After this agreement was made, Contractor alleges that it expended resources removing and stockpiling the surplus topsoil and that it had procured a

buyer for the topsoil. After a portion of the topsoil had been removed and sold to the buyer for $12,960.00, Contractor argues that Owner breached their oral agreement by authorizing the removal of the surplus topsoil by a third party. Contractor avers that it is due $75,347.00 for the fair market value of the soil that Owner had removed.

Phil Loeffler agreed that Contractor was given permission by him to remove a limited number of loads of topsoil, and Owner (by way of Michael Shular) agreed that Contractor could have the surplus topsoil as long as it was, in fact, surplus. Other witnesses testified similarly. The record supports a finding that Owner allowed Contractor to dispose of the surplus topsoil and to haul a limited number of loads for personal use. Here, the issue is whether consideration existed for this agreement.

The trial court found as follows on this issue:

> The topsoil claim is denied for lack of consideration and the absence of preponderance of evidence as to what, if any, understanding occurred between Plaintiff and Defendants regarding the topsoil. Plaintiff miscalculated the soil depth at one location. The Defendants cannot be called upon to pay for this mistake. The fixed price contract as prepared by Plaintiff does not allow for Plaintiff to be compensated for any overage or excess material Plaintiff encounters. Plaintiff's miscalculation does not qualify as extra work under the contract terms.

Common contract principles dictate that, in order for contractual agreement to be binding, the agreement must be supported by valuable consideration. We have defined consideration to mean "either a benefit to the maker of the promise or a detriment to, or obligation upon the promise." *Calabro v. Calabro*, 15 S.W.3d 873, 876 (Tenn. Ct. App. 1999). The trier of fact "may draw any reasonable and natural inference from the proof and if by inference from the proof a benefit to the promisor and detriment to the promisee might be inferred, this will constitute a valid consideration." *Id.* at 876-77.

We are mindful of Contractor's argument that, because the Owner agreed that Contractor could dispose of the surplus, Owner forfeited the right to the surplus topsoil and avoided the task of disposing the surplus material at its own expense. By its plain language, the original Contract requires Contractor to dispose of the surplus topsoil at its own expense. The Contractor must ask Owner's permission before disposing of the surplus material. Common sense provides that Contractor must get permission before disposing of the material because Owner may contemplate using that surplus material for another purpose. Permission to dispose of the topsoil does not equate to ownership in said surplus material. We do not find that Contractor is entitled to claim fair market value for topsoil for that it was contractually obligated to dispose of, nor do we find that Owner waives its ability to use the surplus topsoil for its own purposes, even if it has approved the disposal of the topsoil. On this issue, we affirm the trial court's decision.

*Discretionary Costs*

The final issue concerns discretionary costs. Owner contends that the trial court erred in awarding Contractor discretionary costs and 8% prejudgment interest accruing from January 1, 2005. The appellate briefs are devoid of any argument related to this issue; nonetheless, in the interest of judicial economy, we will address it. In **Progressive Cas. Ins. Co. v. Chapin,** No. W2006-00531-COA-R3-CV, 2007 WL 1946657, * 8-9 (Tenn. Ct. App. July 5, 2007), we discussed the current law regarding discretionary costs:

> Rule 54.04(2) of the Tennessee Rules of Civil Procedure empowers courts to award certain costs and expenses to the party that ultimately prevails at trial. *Scholz v. S.B. Int'l, Inc.,* 40 S.W.3d 78, 84 (Tenn. Ct. App. 2000). An award of costs falls within the reasonable discretion of the trial court, *Long v. Long,* 957 S.W.2d 825, 833-34 (Tenn. Ct. App. 1997), and the trial court may allocate such costs "between the litigants as ... the equities demand." *Perdue v. Green Branch Min. Co.,* 837 S.W.2d 56, 60 (Tenn. 1992) (citing T.C.A. § 20-12-119). In reviewing a trial court's decision to assess costs, this Court employs an abuse of discretion standard. *Id.; see also Mass. Mut. Life Ins. Co. v. Jefferson,* 104 S.W.3d 13, 35 (Tenn. Ct. App. 2002).

In the instant case, the trial court ordered an award of $3,519.03 in costs and expenses against Owner to Contractor, the prevailing party. Under our holding on appeal, Contractor is no longer the "prevailing party." *See McIntyre v. Traughber,* 884 S.W.2d 134, 138 (Tenn. Ct. App. 1994) ("In order to prevail, a party must succeed on a significant issue in the litigation that achieves some of the benefit the party sought when it brought the suit."). While Contractor has prevailed on the issue of written change order waiver and deviations from the Contract, Owner has prevailed on the issue of breach and the topsoil issue. It would, therefore, be inequitable to say that either party is "prevailing." Consequently, the trial court's award of discretionary costs against Owner is vacated.

The judgment of the of the trial court is affirmed in part, reversed in part, and the cause is remanded for further proceedings consistent with this Opinion. Costs of this appeal are assessed one-half to Appellants, Michael L. Shular, Trustee, Shular Contracting, Inc., and Ohio Casualty Insurance Company, and their sureties and one-half to Appellee, M. R. Stokes Company, Inc.

_____W. FRANK CRAWFORD, JUDGE